SIDES CONSTRUCTION CO., INC., et al., Respondents,

v.

ARCADIA VALLEY R–II SCHOOL DISTRICT, Appellant.

No. 38582.

Missouri Court of Appeals, St. Louis District, Division Four.

April 4, 1978.

Motion for Rehearing and/or Transfer Denied May 9, 1978.

Application to Transfer Denied June 15, 1978.

Roberts & Roberts, Geoffrey L. Pratte, Farmington, for appellant.

Spradling, Drusch & Dillard, A. M. Spradling, III, Cape Girardeau, for respondents.

DOWD, Presiding Judge.

This appeal involves a dispute between Sides Construction Company, respondent, and Arcadia Valley R-II School District, appellant, concerning the construction of a school and gymnasium. Respondent contended the appellant owed it $15,000 as the final payment on a construction contract plus $1,510 for additional work. Appellant counterclaimed alleging breaches of the contract in the amount of $158,000.

In this court tried case the trial judge heard complicated and diverse testimony from fourteen witnesses and, we believe, resolved the issues in a fair and reasonable judgment. The judgment entered awarded respondent $3,933.73, representing the $15,000 due on the contract plus $1,265.04 for additional work offset by damages for breaches of the contract totaling $12,331.31 with costs assessed against respondent.

Arcadia Valley R-II School District appeals. This court has been aided by scholarly briefs filed by both parties and commends the attorneys. For reasons hereinafter given, we affirm.

The principal parties to this dispute, Sides Construction Company and Arcadia School District, entered into a standard form "owner and contractor" agreement on September 10, 1969, for the construction of a classroom building and gymnasium for the sum of $1,096,531. The architect for the project was Haywood Snipes, who aided in the designation of specifications and drawings to be incorporated into the contract. Other provisions of the contract provided for monthly progress payments and for final payment, "provided the Work has then been completed, the Contract fully performed, and a final Certificate for Payment has been issued by the Architect."

Work proceeded on the project and, although it was not fully completed, the school district took possession of the classroom building in January of 1971. The gymnasium was available for occupancy in late August of 1971. Monthly progress payments of 90% of the contract price were made as scheduled and in June of 1971 the architect made arrangements for release of the final 10% due on the contract with the exception of $15,000 withheld to guarantee completion of "punch list" items and to cover possible damages for late completion. Prior to occupation of the classroom building and subsequent thereto Mr. Snipes, the architect, prepared "preliminary" punch lists of incomplete or defective aspects of the work. He conceded that the usual practice calls for the preparation by the architect of one punch list after the contractor gives notice that the building is complete, but claimed the preliminary lists were made at the request of Sides and were motivated by the necessity of getting the buildings ready for occupancy due to deteriorating conditions in the old school.

Subsequent to the payment of the 10% holdback a dispute continued concerning the existence of defects and whether they had been corrected. Beginning in 1972 Ar-

cadia contacted several of Sides' subcontractors directly as well as several other companies and paid them to correct alleged defects in the work and in 1975 contracted with Walter Brockmiller, Inc., a second general contractor, to complete work on hardware and locks, power outlets, folding partitions, roof repairs, exterior painting, a backed up exterior drain, and water-damaged ceiling tile. For much of this work Brockmiller utilized the same subcontractors who had performed the initial work for Sides.

Legal action concerning the project was initiated when Robbins Floors, Inc., one of Sides' materials suppliers, sought recovery of $650. Sides subsequently entered a stipulation that it was liable in that amount to Robbins. Sides impleaded Arcadia School District in the amount of the Robbins claim and further alleged Arcadia's liability to them for the balance due on the construction contract, stating that it had performed all conditions precedent and terms of the contract. In its amended counterclaim Arcadia alleged compliance with the contract and that Sides had breached the contract by defective and improper installation and by failure to conform its work to plans and specifications with respect to the following items: (a) the roof, with resulting damage to ceiling tiles, plaster, paint, walls and flooring due to leakage, (b) wiring, (c) intercom system, (d) ventilation and heating system, (e) exterior paint, (f) stage doors, (g) carpeting, (h) locks and hardware, (i) outside drain, and (j) electrical, mechanical, heating and ventilation equipment.

The court's judgment awarded Sides the $15,000 due on the contract and $1,265 for additional work on extension of a drain. As an offset to the final payment the court awarded to Arcadia $12,331.31 representing amounts paid by Arcadia to correct defects.[1]

1. The offset figure of $12,331.31 represented the following payments:
(a) $250 Sides had agreed to pay for testing exterior paint to determine if a "primer" coat had been applied, (b) $5,380.47 paid to Brockmiller, Inc. (the second general contractor) for

performance of its work with the court expressly deducting from the Brockmiller bill of $9,585.82 the amount attributable to its exterior painting ($3,672 expressly allocated to painting and $533.35 of the general contractor fee allocable to the painting), (c) $105.15 paid to

Appellant Arcadia School District's first alleged ground of error alleges that the trial court erroneously received and used evidence of an attempted "settlement" agreement in arriving at its final judgment, as evidenced by the failure to award appellant that portion of the Brockmiller bill attributable to exterior painting. Appellant claims the court was enforcing a settlement agreement reached in a meeting held at the Arcadia School on October 3, 1973, at which appellant claims respondent agreed to repaint an exterior canopy and correct other agreed upon defects within sixty days if appellant would release its claim for defects in other exterior painting and damages for late completion. This action is claimed to be improper because (a) even if a settlement agreement had been reached, the uncontradicted evidence established that the defects had not been corrected within sixty days if at all, (b) offers of settlement are inadmissible, and (c) the offer of settlement was beyond the scope of the pleadings.

■ We hold that the trial court correctly admitted evidence of the meeting between the parties and their attorneys in October of 1973. In a court-tried case the trial judge is allowed wide latitude in the admission of evidence, the court being more qualified than a jury to consider evidence of a transaction and utilize only that part which is competent in arriving at its judgment. *Lee v. Rolla Speedway, Inc.,* 539 S.W.2d 627, 632 (Mo.App.1976). The issue on appeal of a court-tried case is never whether admission of certain evidence was reversible error, but rather whether the evidence was admissible or not and what the judgment of the appellate court should be based upon the admissible evidence. *Menos v. Hodges,* 499 S.W.2d 427, 429 (Mo.1973).

■ The general rule relied upon by appellant is that declarations or concessions made during the course of settlement or compromise negotiations are inadmissible against that party. *Hunter v. Helsley,* 98 Mo.App. 616, 620–621, 73 S.W. 719, 720 (1903); *Greyhound Lines, Inc. v. Miller,* 402 F.2d 134, 139 (8th Cir. 1968). If, however, a court can reasonably determine that the purpose of a meeting is to reach a final agreement as to items that in fact need to be corrected and are not in compliance with contract specifications, the proscription of the general rule does not then apply to resulting statements or agreements. In *Hunter* the court held that the rule against compromise declarations has no effect when evidence showed that a discussion between parties was to ascertain an amount actually owed to plaintiff and not to effect a compromise. 73 S.W. at 720–721. Even if part of the meeting was to effect a compromise agreement between the parties the court would be entitled under the liberal admission of evidence rule to consider evidence of the meeting in order to obtain any relevant evidence contained therein as to defects in the construction.

■ The fact that a period of sixty days was set for completion of the agree-upon items does not necessarily indicate the existence of a "compromise" agreement. Rather, it could be viewed as a mere designation of a reasonable time in which the work should be completed. In *Bremen Bank & Trust Co. v. Bogdan,* 498 S.W.2d 306, 311 (Mo.App.1973), a bank's proposal to make a secured loan to a customer to cover an overdraft was held not to be a compromise but was "merely for the purpose of working out by negotiation a method for satisfying [an acknowledged] debt."

■ There was sufficient evidence from which the court could determine that the purpose of the meeting at the school was to make a final determination as to existing

Vans Electric Company to correct electrical circuitry in the home economics area, (d) $437.07 paid to M.C.S. Engineering for rewiring the public address system in the gymnasium, (e) $1,430.10 paid to Simplex Time Recorder Company to connect several clocks into the master system, (f) $1,207.82 paid to Gale's Heating &

Cooling, Inc., $398.35 paid to Phillip Frueh and $122.35 paid to Barber Coleman for work related to the heating system not automatically starting, and (g) $3,000 of the architectural fee paid by Arcadia for work performed more than 30 days after the contract's completion dates.

defects for which Sides should be responsible despite testimony of several of the participants that it was to settle their differences. While appellant points particularly to the testimony of Harvey Berhle, Sides' job superintendent at the Arcadia project, that the purpose of the meeting was "[t]o try to settle" the punch list problems, it is not clear that he used those words in the "compromise" sense. His prior testimony indicated frustration at receiving multiple punch lists, each with additional items, and could thus be viewed as indicating that the purpose of the meeting was to finalize all legitimate complaints into a final list. The architect testified that because of the need for a January, 1971 occupancy of the classroom building he departed from standard procedure and agreed to prepare "preliminary" check or punch lists during construction. Mr. Donald Sides, vice president of Sides, testified that probably six to eight punch lists were received. Some of those present at the meeting conducted an inspection trip of the project. The record indicated that the school occupied the buildings while construction was being completed, thus forming a basis for legitimate question in some areas as to whether an apparent defect was the responsibility of the contractor or the school. Viewed in this context the court did not erroneously declare and apply the law in receiving testimony concerning discussions or agreements related to the October meeting.

Nor was adherence to a settlement agreement the only explanation for the disallowance of the exterior painting claim. The court heard testimony from Jerry Hotop, a painting contractor who repainted the exterior canopy in early 1974 for Sides, that there was "very little peeling" on the canopy when he first observed it. He also testified that such exterior painting usually must be redone every three to five years. Mr. Sides indicated under questioning by the school's attorney that when he went on a walking tour of the building with the architect at the October meeting he "[didn't] recall any paint on the gutters peeling" despite a prior punch list indicating there was some peeling and, although

some blistering on the gravel guards was observed, there was no indication that it was Sides' responsibility.

Finally, the judgment reveals the court did not feel itself bound by the terms of the attempt at settlement as alleged by appellant. Appellant's attorney testified that among the items Sides did not agree to correct at the meeting was a problem with the stage clock not resetting with the master clock and a problem with the stage door jumping its track. However, damages for such items were allowed in the court's judgment for payments made to Simplex Time Company and Brockmiller Company.

Appellant's second point is that the court's judgment was against the weight of the evidence and not supported by substantial evidence because it did not award appellant full damages for repairs to the roof, electrical work, the total architect's fee for work performed more than thirty days after the designated completion dates, yard work necessitated by Sides having to do return work on a buried cable, carpet deterioration, and replastering and repainting, "because these damages were uncontradicted as well as supported by expert testimony, or were covered by the purported offer of compromise."

■ This court, under Rule 73.01, reviews court-tried cases on both the law and the evidence as in suits of an equitable nature, with due regard for the opportunity of the trial court to judge the credibility of the witnesses. The judgment of the trial court should be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *Murphy v. Carron* expressly contains the caveat that a judgment should be set aside with caution on the ground that it is against the weight of the evidence and then only with a firm belief that the decree or judgment is wrong. When, as here, the trial court issues only its judgment without detailing its findings of fact and conclusions of law, all fact issues

are deemed found in accordance with the result reached and the judgment affirmed if it is correct on any reasonable theory supported by the evidence. *De Paul Hospital School of Nursing, Inc. v. Southwestern Bell Telephone Co.,* 539 S.W.2d 542, 545 (Mo.App.1976).

Appellant first claims error in not awarding it $17,000 in damages to cover the cost of a contract entered into on April 29, 1976 between appellant and Drury Company to repair the roof of the school, specifically (a) cutting and patching noticeable blisters, (b) power brooming existing gravel and retopping and regraveling, (c) installing a new roof control joint, for a subtotal of $14,731, (d) installing stack vents for $725, and (e) fixing the canopy so that it drains in a bondable condition for $2,740, for a total contract price of $18,196.

In awarding part of the damages requested for additional work on the roof the court reasonably resolved judgment and factual questions related to (a) the existence of roof damage and resulting leaks, (b) the extent of such damage, (c) the success of the efforts of Sides and Brockmiller (through Pyramid Roofing Company) in correcting existing defects, (d) the extent to which the defects were repairable short or total roof replacement, and (e) the extent to which problems may have been present even had plans and specifications been complied with.

An unspecified portion of the $14,731 Drury contract for work on the main part of the roof was for cutting and patching "noticeable" blisters—an item the trial court could have found was incorporated into the roofing part of the Brockmiller bill for which the court made full allowance of $1,500. In addition, there is little evidence in the record concerning the front canopy not draining properly, or that total replacement was necessary. If replacement was necessary it would not have been proper for appellant to insist on May 30, 1972, that it be repainted as a punch list item. This item, as noted, constituted $2,740 of the $18,196 Drury Company contract.

Mr. Brockmiller testified on examination by the court that he was contacted by the architect and superintendent in the fall of 1974 to correct a specific list of defective items, and that his work commenced in the spring of 1975. On examination by the appellant's attorney he testified that before his men commenced work there were blisters and cracks on the roof with air and water pockets, and that leaks were present. His company "hired the same sub-contractor who supposedly did the roofing . . . and went back over it with them and left it pretty well up to [the subcontractor] to fix the blisters and leaks that were up there." Brockmiller concluded on examination by the court that when his men completed work they had corrected the items presented to them by appellant and that "the leaks had been stopped." He also stated that neither the superintendent nor the architect had made any complaint to him concerning his company's work since its completion.

Pyramid Roofing Company, the roofing subcontractor who performed the work for Sides and Brockmiller, had communicated to the school that the roof did not require additional work. Pyramid notified Sides by letter on August 22, 1972, that the blisters on the roof and two designated leaks were repaired as of August 16, 1972. Appellant claimed not to be aware of a roof bond in the amount of $5,780 issued by the manufacturer of the roofing materials listing appellant as owner. The architect testified that the roof manufacturer makes a field inspection prior to issuing a roof bond and agreed that the bond is some evidence that "the roof conforms to the specifications of that type of roof." The architect's field inspector (a licensed architect) was present while the roof was being built, and both he and Mr. Snipes were present when the roof was poured, and neither saw any evidence of improper workmanship. He stated that no problems appeared on the roof until the following summer.

The superintendent of the school district, Jimmy Dale Maguffee, conceded on questioning by respondents' attorney that the areas of leakage at the time of the October meeting in 1973 were around the heating unit and southeast furnace in the gymnasi-

um and in the classroom building, principally over a small section of lockers and in the kitchen. Respondents introduced into evidence a letter of March 14, 1973 from the architect to Sides which noted that a heavy rain had fallen prior to March 10 and that there was a leak in the southeast corner of the gym near the furnace, as well as a drainage backup into a locker room. No other instance of leakage was mentioned in the letter.

There was testimony by Snipes and Brockmiller that the particular roofing agreed upon by the parties may have been susceptible to blistering. Mr. Snipes stated he had approved "a new roofing system" and that "many people were beginning to have trouble with that type of roof." Brockmiller testified that on that type roof there may be pockets of water or air blisters even though properly installed, though not with the frequency testified to. He noted that often a blister does not result in a leak and that the owner will let the air or water out and fix the defect.

■ All of this evidence had to be considered against appellant's extensive evidence as to defects present in the roof and failure to conform to specifications. On these facts we cannot hold that the weight of the evidence required the trial court to award the full damages requested for alleged defects related to the roof. There was room for reasonable doubt as to the extent of the defects for which Sides was responsible as well as to the necessity of the extensive repair contemplated by the Drury contract. Damage allowable for roof defects is the reasonable cost of conforming a roof to specifications. *Herbert & Brooner Construction Co. v. Golden,* 499 S.W.2d 541, 552 (Mo.App.1973).

■ The court's refusal to make allowance for the other damages claimed in this point is supported by the evidence under the review standards of Rule 73.01 and *Murphy v. Carron* and by the general rule that while damages need not be established with absolute certainty, reasonable certainty is still required as to both existence and amount. The evidence must not leave the matter to speculation. *Hargis v. Sample,* 306 S.W.2d 564, 569 (Mo.1957); *Warner v. Southwestern Bell Telephone Co.,* 428 S.W.2d 596, 604 (Mo.1968). One element of "reasonableness" is the extent to which the party has established the damages as well as it could under the circumstances. In *Hargis* it was held that the amount of estimated loss should, in event of uncertainty, at least be supported by the best evidence available. 306 S.W.2d at 569. Several of appellant's claimed elements of damage are infirm under these considerations.

■ Appellant relied solely on the testimony of Mr. Maguffee, the superintendent, to establish that electrical wiring in the stage and shop area was not wired according to specifications and that "Oh, it would probably cost around [$500]—that's a rough figure—to get those things up [to specifications]." He testified that the school had to expend "a couple hundred dollars and our own labor" for "reseeding and relandscaping our school grounds" when "[Sides or its agent] had to come back and retrench it [the school yard] because they had forgotten to hook up some things." Despite the fact that the money had actually been paid there was no attempt to state how or on what items the money was expended, the exact amount paid or to whom it was paid. In a similar category is the "actually incurred" expense of $375 to $450 for custodial wages allocable to work performed regluing unraveled carpet seams. The superintendent did not state with reasonable certainty the number of hours spent on the work, the number of custodians involved, nor their hourly wages other than that of the head custodian.

Mr. Maguffee also estimated the amount necessary to replaster and repaint the kitchen ceiling and one of the restrooms due to leakage. Beside some question as to the necessity of replastering the entire ceilings, a factual issue was created as to whether steam from a dishwasher in the kitchen was responsible for some of the plaster damage. The court could also have reasonably found that the Brockmiller bill contained a sufficient allowance for damage to ceilings from

any leakage, and that ceiling damage from future leakage was too speculative.

Nor could the court have awarded appellant $5,000 for the expense of resanding, resealing, and relining the gymnasium floor because of buckling from water damage without engaging in speculation and conjecture. The evidence was vague as to the extent of damage with testimony that there was "some floor damage where the hardwood floor is bucking up." No basis was provided for an estimate that the rental of necessary sanding equipment would cost $5,000, or whether other expenses were incorporated into that estimate.

Appellant's final two claims for damage under this point include $6,000 for reduction of carpet life from twenty-five to fifteen years due to improper installation (based upon initial cost of $15,000) and $9,600 in architectural fees not awarded for work performed "in trying to get the many defects straightened out."

The architect did testify that there was improper gluing of the carpet seams causing some unraveling at the edges and that "it will continue to possibly ravel at the edges when the carpet sweeper goes over the edges and where it is not properly glued in the seams." The superintendent testified that with maintenance work the carpet was "in fair shape now", thus creating a factual issue as to the extent to which the carpet would unravel in the future. The architect testified that the middle of the carpet could last a hundred years and that the defect went primarily to the appearance of the carpeting at the seams. Based upon that testimony there was justification for substantial uncertainty as to the extent of the defect in the carpeting, the extent to which the defect would persist in the future, and the effect of the defect on the "carpet life."

The claim for architectural assistance was based on a bill tendered by Mr. Snipes on January 1, 1976 for extra work performed more than thirty days after the contract's completion dates, as provided for in an agreement between appellant and architect. The bill covered a period of five years and

listed 500 hours of professional services at $16 an hour ($8,000), overhead and office expenses of $4,000, and 5,000 miles use of his car at 12 cents per mile ($600) for a total bill of $12,600. This element of damage was not pleaded in appellant's counterclaim but was tried with the implied consent of respondents under Rule 55.33(b). The court allowed $3,000 of the bill as an element of damage. We decline to hold the trial court erred in not holding Sides responsible for the full amount of the Snipes bill as submitted. Neither the bill itself nor accompanying testimony made an attempt to specify dates or times over which the 500 hours of work and 5,000 miles were allocated during the "dozens and dozens" of trips to the school site, nor was the necessity of making that number of trips established. The architect's "best estimate" as to the number of trips made to the site in connection with the project was "fifty to seventy-five." An unspecified part of the architect's time was spent on work for which no damages have been allowed—for example, negotiations with the Drury Company. On this state of the record it was a matter of judgment for the court to make as to the amount of the architect's time over the five-year period for which the contractor's breaches were responsible. Due to the failure of appellant to document the $12,600 bill any better than it did we do not profess to be in any better position to make such an allocation than was the trial court.

Appellant alleges in his third point that the trial court erroneously applied the law in not granting the liquidated damages of $25 per day for late completion provided for in the contract. The contract provided that the classroom building was to be completed by September 1, 1970, and the gymnasium by December 30, 1970. Appellant argues that (1) liquidated damages did not have to be specifically and affirmatively pleaded when they "were a provision of the very contract placed in issue" and (2) even if liquidated damages did have to be affirmatively pleaded, the pleadings should have been amended to conform to the evidence when evidence was received relative to the

contractual completion date without timely objection.

Appellant seeks to use the liquidated damage clause of the contract as a "sword" to collect damages of approximately $6,000, and not as a defense to its obligation to make final payment under the contract. Appellant's argument that the clause is not an affirmative defense and thus need not be specifically pleaded under Rule 55.08 is thus inapposite. Rule 55.05 states that "[a] pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim or third-party claim, shall contain (1) a short and plain statement of the facts showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief to which he deems himself entitled." "A 'counterclaim' is a counterdemand existing in favor of a defendant against a plaintiff and includes set-off and recoupment . . .." *Schroeder v. Prince Charles, Inc.*, 427 S.W.2d 414, 419 (Mo.1968). While the performance or occurrence of conditions precedent may be pleaded generally, "[a] denial of performance or occurrence shall be made specifically and with particularity." Rule 55.16. Nowhere in appellant's pleadings does it allege noncompliance with the contract due to late completion or the existence of a liquidated damage provision, either on a theory of affirmative breach or under a theory of setoff.

The remaining issue is thus whether appellant should be deemed to have amended his pleadings to conform to the evidence produced as to late completion and the existence of a damage clause in the contract. Rule 55.33(b) provides that issues not raised by the pleadings shall be treated as if so raised when they are tried by express or implied consent of the parties, and the pleadings will be deemed amended to conform to the evidence.

Appellant cites testimony introduced at trial relative to the contractual completion dates, that performance was not completed on those dates, and that no extensions of time were granted by appellant. The superintendent testified that the kitch-en was not complete in January of 1971 when the school moved in and that the school had to rent a van to transport food to the high school from the elementary school for the rest of that school year. Students were transported to the old high school for physical education, shop, and music classes. Subsequent to this testimony the following exchange between the superintendent and appellant's attorney took place:

"Q. Does the contract provide for a penalty for non-completion by the dates specified?

A. Yes, it does.

Q. How much is that penalty as provided in the contract?

A. I think it is twenty-five dollars a day.

Mr. Spradling: Your honor, I am going to object to any penalty because it is not pleaded in the counterclaim by the School District and therefore it is beyond the scope of the pleadings.

\* \* \* \* \* \*

The Court: The objection will be sustained."

We hold the court did not err in declining to award appellant the liquidated damage provided for in the contract and in sustaining respondents' objection to testimony concerning the damage provision on the ground it was not pleaded. Based upon the testimony cited appellant claims objection came only when the question of how much liquidated damage was provided for was asked. We cannot agree that respondents gave their implied consent to the trial of this issue, and hold that the objection was sufficient to withhold consent from the trial of both the existence and amount of liquidated damage. The cases principally relied upon by appellant involve situations in which the party did not object at trial to an unpleaded issue being raised, *Kennedy v. Tallent*, 492 S.W.2d 33, 38 (Mo.App.1973) (claimed error in giving an instruction), *Middleman v. Complete Auto Transit, Inc.*, 486 S.W.2d 456, 462 (Mo. banc 1972) (no objection on

basis that issue was outside of the pleadings) or in which a plaintiff's own exhibit established an unpleaded affirmative defense. *Household Finance Co. v. Watson,* 522 S.W.2d 111, 114 (Mo.App.1975).

▇ Appellant's final point claims the court erroneously applied the law in granting respondent Sides final payment on the contract because the contract's terms provided for such payment only upon fulfillment of certain conditions, and the evidence from both parties indicated such conditions had not been fulfilled. Appellant cites the following provisions of the contract, incorporated therein by the general contract specifications, as establishing two conditions precedent to final payment that were not satisfied by Sides:

> "Full and Final Payment of the Contract Sum shall be made within Thirty Days of the Completion of all of the following Requirements:
>
> (a) Architect's Written Certification to Owner that the Building is Complete,
>
> (b) Payment of all Labor & Material Bills and Receipt of Final Affidavit from General Contractor that all Payrolls, Bills for Equipment, and Other Indebtedness connected with the Work have been Paid or otherwise satisfied. . . . "

The general conditions further provided that the owner could withhold payments if the architect withheld certification of approval in order to protect the owner from loss due to, in part, defective work not remedied, contractor's failure to promptly pay subcontractors for labor and materials, or architect's reasonable doubt the project could be completed for the unpaid balance of the contract price. Such withheld payments would be paid "upon satisfactory removal of any such grounds." Another provision provided that the contractor would not be entitled to the final payment nor to any portion of the retained payments until satisfactory evidence was given the owner that all indebtedness in connection with the project had been paid.

Appellant cites the following transcript testimony as establishing that these condi-

tions had not been met: (1) neither the architect nor the superintendent have ever given final approval to the building nor approved final payment, (2) Mr. Sides testified that the heating and electrical and several other subcontractors were never paid, nor could he recall supplying an affidavit certifying that all work under the contract had been performed in accordance with its terms, and that all material and subcontractor bills had been paid, and (3) the architect testified that neither appellant nor he had ever received notice from Sides that the building was complete and ready for final inspection.

As provided for in the contract and general conditions to the contract, "on proper certification of architect," Sides was compensated by an accumulation of monthly progress payments to a sum equal to 90% of the value of the work performed. Based upon apparent certification by the architect that substantial completion of the entire work had taken place a sum sufficient to increase total payments to 100% of the contract price was paid, "less such retainages as the architect [determined] for all incomplete work and unsettled claims."

Courts have traditionally recognized the difficulty of literal compliance with construction contracts. In Missouri it has been held that substantial compliance with specifications constitutes completion as a matter of law, and that a building is complete and the builder entitled to recover the contract price, less sums necessary to correct defects, when the builder's performance is substantially in compliance with the contract. *Bullock Co. v. Allen,* 493 S.W.2d 5, 7 (Mo. App.1973). *Phoenix Assurance Co. v. Appleton City,* 296 F.2d 787, 792 (8th Cir. 1961) held that "under Missouri law a strict and literal compliance with the terms of the contract is not required, and . . . the [owner] would be required to accept the improvement if the contractor has substantially complied with the construction contract."

The contract in this case does set forth certain conditions precedent to the full and final payment of the contract sum, but the

court's judgment in this case did not make such an award. Taking the court's judgment as a whole, the final amount allowed to the contractor was reduced by the majority of the sums the architect ordered withheld from the total contract price in order to protect the owner from specified losses. Appellant did not establish what portion of the retained payments was necessary to protect it from loss due to Sides' failure to pay in full several of its contractors, nor that any sums were withheld because of failure to make any such payment. Relevant also was appellant's action in taking over the contract and dealing either directly or indirectly with the unpaid subcontractors and making payments to them which were subsequently used to justify withholding payments on the contract. Appellant made no request for lien waivers or evidence of payments at the time the project was substantially completed and the 10% withheld amount paid. Under these circumstances the conditions in the contract did not prevent the award which the court made.

■ The trial court thus acted in accord with prior authority that when a school construction contract provides for final payment after certification of substantial completion, provided the contract be then fully completed and performed, and the school district is in fact using the building, the contractor is then entitled to be paid the contract price less sums necessary to remedy defects and bring the building into conformance with plans and specifications. This was the holding in *Bloomfield Reorganized School District v. Stites,* 336 S.W.2d 95, 100–102 (Mo.1960), even though the evidence established that the building was not in fact completed. *See* 13 Am.Jur.2d Building and Construction Contracts § 41 (1964) —contractual provision that final payment is to be made when the work is completed or that work is to be performed to owner or architect's satisfaction does not take case out of general rule permitting recovery of the contract price less damages for failure to perform strictly under the substantial performance doctrine. *Standard Millwork & Supply Co. v. Mississippi Steel & Iron Co.,* 205 Miss. 96, 38 So.2d 448, 451 (banc 1949).

Because the architect here did approve progress payments and the full payment less the retained amount upon substantial completion and the court did not award full and final payment of the contract price, this opinion is not at variance with established precedent as to the conclusiveness of good faith decisions of an engineer or architect as to whether work has been performed in accordance with the contract. *Massman Construction Co. v. Lake Lotawana Ass'n,* 240 Mo.App. 469, 210 S.W.2d 398, 402 (1948); *Public Water Supply District v. Maryland Cas. Co.,* 478 S.W.2d 293, 295–296 (Mo.1972). If a contract provides for acceptance of work by an engineer before payment the contractor cannot recover the whole amount to be paid without obtaining such approval. *Myers v. Union Electric Light & Power Co.,* 334 Mo. 622, 66 S.W.2d 565, 569 (1933).

■ The general conditions to this contract as to "payments withheld" provided that upon satisfactory removal of the grounds for withholding of payments the payments so withheld would be made. Whether the school was justified in withholding the amounts from the contract price thus became a factual issue for the trier of fact to resolve after considering all of the testimony and evidence presented at trial. Expenditures necessary to make work conform to the contract or protect owner against loss is a question for the trier of fact. *Talbot-Quevereaux Construction Co. v. Tandy,* 260 S.W.2d 314, 316 (Mo.App. 1953). We conclude that under the evidence presented in this case the court did properly determine the amount to be withheld consistent with the contract.

We have reviewed the case upon the law and the evidence under the established guidelines and now affirm the judgment of the trial court that Sides Construction Company recover the sum of $3,933.73 from Arcadia Valley R-II School District.

The judgment is affirmed.

SNYDER, J., and ALDEN A. STOCKARD, Special Judge, concur.