John HAGGARD, Jr., d/b/a Haggard Heavy Hauling, Plaintiff-Respondent,

v.

MID–STATES METAL LINES, INC., a Corporation, and St. Joseph Structural Steel Company, a Corporation, Defendants-Appellants,

and

Sharp/Kidde/Webb, a Joint Venture, Defendants.

No. 29821.

Missouri Court of Appeals, Western District.

Oct. 29, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 3, 1979.

Application to Transfer Denied Jan. 15, 1980.

Harry D. Dingman, Kansas City, W. Raleigh Gough, Independence, for Mid-States Metal Lines, Inc.

R. A. Brown, Brown, Douglas & Brown, St. Joseph, for St. Joseph Structural Steel.

Robert L. Shirkey, Kansas City, for plaintiff-respondent.

Before HIGGINS, Special Judge, Presiding, SWOFFORD, C. J., and WELBORN, Special Judge.

ANDREW JACKSON HIGGINS, Special Judge.

Appeal by defendants Mid-States Metal Lines, Inc. and St. Joseph Structural Steel Company from judgment for plaintiff for $120,276.75, for extra work. The questions

are whether plaintiff made a case under any of his pleaded theories for recovery; and, if so, the damages recoverable. Affirmed in part and reversed in part.

This dispute arose from construction of the Truman Sports Complex in Kansas City. Jackson County, Missouri, sponsored the idea of the complex, acquired land on which to build football and baseball stadiums, and secured approval of the bond issue necessary for the land purchase and the construction. The Jackson County Sports Authority was formed to supervise the project for Jackson County; Kivett & Myers was retained as the architect, Campbell and Associates was retained as the engineer.

In early 1968 the architect provided architectural drawings which showed the general outline, design, and overall dimensions for both the football and baseball stadiums. Bids for work shown by the drawings were solicited and a number of general contractors responded. All were rejected because they exceeded the county's budget.

At the direction of the owner, the architect and engineer eliminated and reduced some items to bring the project within the budget. A second round of bidding was opened in 1969 and a general contract for approximately $29 million was awarded to a joint venture, Sharp/Kidde/Webb, sponsored by Sharp Brothers Contracting Company.

Prior to making its first bid, S/K/W asked Mid-States to furnish a substantial part of the structural steel. Mid-States, in turn, consulted Haggard, a heavy hauler, with the view that he would haul some of the steel from the Mid-States fabrication plant in Grandview and unload and erect it at the jobsite. Based upon the original architectural drawings furnished him by Mid-States, Haggard made a preliminary bid to Mid-States. With Haggard's bid in hand, Mid-States then made its bid to S/K/W.

After the plans were pared by the architect and engineer, a new set of architectural drawings was made. This second set was made available to Haggard and he made an oral bid to Mid-States of $95 per ton. He based his bid in part on two considerations: that the architectural drawings showed the bents and hammerheads all in one piece requiring no field assembly other than to attach the entire assembly to the embedded base in the stadiums' foundations; and that he was told by Mid-States that the fabricated pieces would come "in as large a pieces as I could haul."

Written acceptance of Haggard's proposal occurred sometime after when he received purchase orders 9 and 10 from St. Joseph. Although Haggard made his oral bid to Mid-States to haul, unload, and erect at a rate of $95 per ton, Mid-States sublet a portion of its contract to St. Joseph. In furtherance, Mid-States sent its purchase order 1330 to St. Joseph which then sent purchase orders 9 and 10 to Haggard requesting that he perform the hauling, unloading, and erecting originally called for in purchase order 1330 from Mid-States.

Upon receipt of purchase orders 9 and 10 from St. Joseph, Haggard called Mid-States and discussed them with Winston Apple who had initially invited Haggard to make the bid. Apple explained that Mid-States had sublet that part of the contract to St. Joseph and assured Haggard that his bid had been transferred directly to St. Joseph. Advised of no changes from the original understanding, Haggard signed and returned purchase orders 9 and 10 to St. Joseph on the assumption that his arrangement with St. Joseph would be the same as it would have been with Mid-States.

The chain of command was S/K/W as the general contractor, responsible for the overall job; Mid-States as a first tier subcontractor; St. Joseph as a second tier subcontractor; and Haggard as a third tier subcontractor.

Purchase orders 9 and 10 contained the terms of agreement between Haggard and St. Joseph. They provided that Haggard was to "furnish and erect" for the football stadium:

"sound system supports and catwalks, lighting and catwalks";

and for the baseball stadium:

"outfield lighting support and catwalks, infield lighting supports and catwalks,

weather canopy supports, excluding roof deck and accessories".

After signing purchase orders 9 and 10, Haggard secured a performance bond as required and waited for St. Joseph to advise him when the shipments of fabricated steel were ready at St. Joseph's plant in St. Joseph, Missouri. Because of a general construction strike, the first load was not hauled until April, 1971.

The items hauled and erected by Haggard consisted of:

(1) "bents," pieces of steel from 25 to 100 feet in length, 28 in the football field and 40-odd in the baseball field;

(2) "hammerheads," "L" shaped assemblies of steel attached to the outward end of the bents designed to hold the light and sound cages;

(3) "light cages" which held the floodlights;

(4) "sound cages," one for each stadium holding the public address system; and

(5) "catwalks," steel railings connecting the bents designed to allow maintenance of the lights.

Apart from the original architectural drawings which showed general outlines and design, each subcontractor was required to prepare "shop drawings" showing the details of his particular work. St. Joseph prepared such refined drawings, submitted them to Mid-States who submitted them to S/K/W who had them approved by the owner, architects, and engineer. The plans then made their way back down the chain of command, returning to St. Joseph who had drawn them in the first place.

These shop drawings or blueprints were prepared as the job progressed. It was the custom of St. Joseph to deliver the shop drawings applicable to any shipment along with that shipment so Haggard would know how to erect the materials on the jobsite.

Unlike the architectural drawings on which Haggard had based his bid, the shop drawings showed the hammerheads to be fabricated separate and apart from the bents, and that the bents and hammerheads were to be assembled in the field.

When he discovered that more field assembly and welding would be required of him than originally anticipated, Haggard complained to St. Joseph. St. Joseph replied that under the plans and specifications, the shop drawings, and his contract, the amount of assembly required of Haggard was proper, and insisted he do the work.

Haggard continued to complain to St. Joseph and also to Don Sharp, the project supervisor. On several occasions he threatened to walk off the job. It was made clear to him, however, that if he did so, he would be sued on his performance bond which covered, among other things, his home and company assets. Haggard thereafter completed the work required of him despite the dispute over terms and price.

The general assembly, essentially, went this way: the bents were attached to the foundation of the stadiums; to these were welded the "L" shaped hammerheads, and fitted inside the "L" of the hammerheads was a light or sound cage. The light cages came in a "knocked down" condition in small bundles to be assembled at the jobsite. Before the light cages or sound cages could be installed and erected, some electrical wiring had to be performed by the electrical contractor. This wiring was done while the bents, hammerheads, and cages were on the ground, then the whole assembly was hoisted in one piece.

Another controversy surrounded Haggard's use of a so-called "Skyhorse" crane. Haggard owned and used his own cranes in doing much of the erection work called for under his contract. For some of the taller and heavier pieces, however, he was unable to do that work with the cranes he owned and used. He had to rent instead S/K/W's "Skyhorse" crane for which he paid $249.50 per hour for crane and crew. Haggard contended that were it not for the increased weight caused by the preassembly of certain electrical work on the ground, his rental of the "Skyhorse" would have been unnecessary as his own cranes would have

sufficed. Appellants contended that Haggard's own machinery was inadequate in any event.

Plaintiff's suit against S/K/W, Mid-States, and St. Joseph contained four counts. Important to this appeal is Count II which alleged: that St. Joseph furnished plaintiff with plans and specifications on behalf of itself and other defendants which "implied, warranted and/or represented" that the list of materials which were to be installed would require plaintiff to "haul, unload and erect" the items shown on purchase order 1330, which were represented to be a "true picture of the quantity and type of material that was to be hauled, unloaded and erected." It further alleged that plaintiff relied upon the "implied warranties" made by St. Joseph and "accepted, confirmed and condoned" by the other defendants, and agreed to do the work at an agreed price in reliance thereon; that said "warranties and/or representations" were "false, either intentionally or mistakenly," they were "grossly inaccurate and recklessly made," in that plaintiff was required to do additional work, "constituting a breach by the defendants" of their agreement with plaintiff; that the types of materials to be hauled, unloaded and erected were unknown to plaintiff but were known or "should have been known" to defendants; that plaintiff was damaged by the defendants "breaching said contract" in the sum of $100,723.63, for which judgment was prayed.

Plaintiff's prayer was for extras which resulted from (a) the field assembly and welding of hammerheads to bents made necessary because these did not come in one piece as promised; (b) the field assembly and welding of catwalks, also made necessary because these came in more pieces than promised; (c) rental of the "Skyhorse" crane made necessary by the increased weight caused by preattaching the light cages to the hammerheads before erection; (d) refabrication of channel purlins and bent plates; (e) additional welding because some "straps" on the backs of some cages did not pull up against the "Nelson stud" embedded in the base to receive them; (f) extra welding necessary because outfield light support bents needed more welds because they were shipped in more pieces than promised; (g) the added weight of hoisting the light cages which resulted from the electricians' installation of the lights before hoisting of the cages; and (h) expense of six days delay in setting the light cages which occurred because the light had been installed on the ground causing additional weight thereby making it impossible to hoist them in high winds.

The trial judge, sitting without a jury, issued a memorandum opinion, findings of fact, and conclusions of law in favor of plaintiff. The trial court concluded that Haggard's acceptance of the offer from St. Joseph to haul, unload, and erect at a rate of $95 per ton was induced by Mid-States thereby embracing the negotiations between Mid-States and Haggard. The court found the conduct of Mid-States and St. Joseph constituted fraud and deceit practiced on Haggard and the expenses of any added assembly and welding required of Haggard by reason of the misrepresentation were due and owing.

In addition, the court found that the word "erect" as used in purchase orders 9 and 10 between St. Joseph and Haggard did not include, as contended by defendants, all field assembly necessary to placement in the upright position. Rather, the court found that field assembly was not included in the term "erect" which meant only "to set upright" and any field assembly required of Haggard was not within the terms of his contract and therefore constituted additional work for which payment was due and owing. More specifically, this applied to the bents and hammerheads, catwalks and light cages which came in pieces requiring assembly before erection. The court also found that it was not part of Haggard's contract to hoist the light cages with the added weight of the lights already installed by the electricians and such added weight gave rise to extra charges not covered by the contract for (a) rental of a larger crane; (b) delay in hoisting the added weight in high winds, and (c) the added weight itself.

The court found the total of extra charges not covered by Haggard's contract together with interest computed to date of judgment, August 19, 1977, to be $120,276.75 and entered judgment accordingly against both St. Joseph and Mid-States. The judgment absolved S/K/W.

Appellants contend that plaintiff's petition did not sufficiently plead a count of fraud and deceit, and even so, there is no evidence in the record to support such a finding, in particular, the required element of intent. Absent a supportable theory of liability, they argue the judgment must be reversed.

 This judgment is for affirmance if plaintiff stated a cause of action in his pleadings and adduced evidence to support that cause of action; it need not be the same as that found by trial court. In this court-tried case, review is on the law and evidence giving due regard to the trial court's judgment as to credibility of witnesses, with this court to enter such judgment as the trial court should have entered. Rule 73.01, as construed, *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976); *Richter v. Richter,* 532 S.W.2d 903 (Mo.App.1976); *City-Wide Asphalt Co., Inc., v. City of Independence,* 546 S.W.2d 493 (Mo.App.1976).

Plaintiff pleaded a cause of action as defined in 76 ALR 268, 269, adopted in *Clark v. City of Humansville,* 348 S.W.2d 369 (Mo.App.1961):

> "that where plans or specifications lead a public contractor reasonably to believe that conditions indicated therein exist, and may be relied upon in making his bid, he will be entitled to compensation for extra work or expense made necessary by conditions being other than as so represented."

In *Clark v. City of Humansville,* supra, defendant city had solicited bids for a sewage disposal project which it advertised as requiring "approximately" 18,000 cubic yards of earthwork. The contractor which had been the successful low bidder brought an action for damages as a result of having to move 36,000 cubic yards of earth to complete the project. The trial court granted the City's motion to dismiss for failure to state a cause of action. The judgment of dismissal was reversed because "cases, such as the instant one, are not suits which properly may be fit or forced into the mold for conventional fraud and deceit actions and in which sufficiency of the petition depends upon averment of all essential elements in such actions * * * (i)n many instances there is liability for business loss caused by misrepresentations which are not fraudulent, i. e., when 'scienter' is not present * * * the basis of a suit such as this is that 'there was a deceptive representation . . . and it misled' " 348 S.W.2d 372, 373. See also *Rock Hill Asphalt Construction Co. v. State Highway Commission of Missouri,* 452 S.W.2d 810 (Mo. banc 1970); *Denton Construction Co. v. Missouri State Highway Commission,* 454 S.W.2d 44 (Mo.1970).

 The court recognized that the cases are not in agreement as to the theory upon which recovery is permitted in actions of this character and adopted the view "that this is not an action on the contract but rather one 'to recover damages for the misrepresentation by which the contract was induced'." 348 S.W.2d 371. "In final, it appears that actions of this character are *sui generis* in nature and sound in tort." 348 S.W.2d 373; *Samuel Kraus Co. v. Kansas City, Mo.,* 315 S.W.2d 758 (Mo.1958).

Plaintiff proved a cause of action under the foregoing rule. He adduced evidence that Mid-States, in securing the bid from Haggard, affirmatively represented via the architectural drawings that the bents and hammerheads would come in one piece requiring only one weld to erect each; that Haggard was told by Mid-States that other items would come in larger pieces than they ultimately did; that Haggard bid to Mid-States on the basis of such representations; that Mid-Sates transmitted Haggard's bid to St. Joseph along with Mid-States' purchase order 1330 which had been the basis on which Haggard had made his bid to Mid-States; that St. Joseph adopted the representations of Mid-States upon its offer of purchase orders 9 and 10 with purchase

order 1330 attached; that St. Joseph showed nothing new or different to Haggard on the basis of which he should change the bid already made to Mid-States; that Haggard signed and thereby accepted the terms of purchase orders 9 and 10 undertaking a contract which required more of him than had been required at the outset; that Haggard performed all work required of him in a good and workmanlike manner; and that Haggard was thereby damaged.

■ It is also contended that the trial court violated the parol evidence rule in that it found that certain oral statements made by Mid-States to Haggard were transmitted to St. Joseph and were incorporated by St. Joseph into the contract with Haggard. The parol evidence rule provides that extrinsic evidence is inadmissible to vary, alter, or contract a written instrument where the instrument is complete, unambiguous, and valid, or there is no fraud, accident, or mistake, or claim or allegation thereof, with respect to the instrument. See, *Sullivan v. United States,* 363 F.2d 724 (8th Cir. 1966) citing, 3 Corbin, Contracts, § 373 (1960) and 32A CJS Evidence § 851 (1964). The pleadings and evidence demonstrate that this suit involved a claim or fraud. In such a case, the parol evidence rule does not operate to exclude the circumstances surrounding the agreement. *Smith v. Tracy,* 372 S.W.2d 925 (Mo.1963).

Appellants charge the court erred in its findings, "The word 'erect' in its clearest context based upon the testimony herein reflected means to 'set upright,' 'to rear,' 'to cause to stand up' and 'to set up'." They argue that everyone at trial with the exception of the plaintiff agreed that included in the meaning of 'erect' is all assembly required to put something up, i. e., to put together any component parts necessary to erect.

■ In ascribing meaning to the word "erect" in the context of this suit, the trial court properly considered the circumstances surrounding the making of that contract. *E. O. Dorsch Electric Co. v. Plaza Construction Co., Inc.,* 413 S.W.2d 167 (Mo.1967). Haggard agreed to "erect" certain items based upon plans furnished him by Mid-States which showed those items to be in one piece. Irrespective of the many meanings this word could have, based upon the representations made to plaintiff during the pre-contract negotiations, the judge could properly find that "erect" for the purposes of this contract did not include such field assembly as plaintiff ultimately was required to do.

■ Appellant Mid-States argues that any finding based on a warranty theory is necessarily erroneous as to it because it entered into no contract with plaintiff and cannot be held liable on that basis. It has been demonstrated that this cause of action sounds in tort, and contract cases and their requirements of privity do not govern. *Clark v. City of Humansville,* supra, at 374.

The trial court enumerated what it found as damages in its "findings of fact" 8 through 21. Appellants contend that the court's findings of damages are not supported by the evidence even if a theory of liability does exist.

■ Generally, damages need not be established with absolute certainty, but reasonable certainty is still required as to both existence and amount and the evidence must not leave the matter to speculation. *Sides Construction Co., Inc. v. Arcadia Valley R–II School Dist.,* 565 S.W.2d 761 (Mo. App.1978).

■ Findings nos. 11 and 12 involved Haggard's refabricating channels, purlins, and bent plates. It was not proved with any certainty who was responsible for those charges. Plaintiff himself testified he was not sure what had caused the difficulties, whether it was the original design, or whether the bases had been set improperly by the general contractor, or whether St. Joseph had fabricated the items improperly. Findings nos. 11 and 12 must, therefore, be reversed.

Finding no. 13 dealt with "overtime welding bents and assembling cages." Plaintiff testified that this charge was not called for in his contract with St. Joseph nor in the

original purchase order 1330 from Mid-States and that if anyone was responsible for payment of this extra bill, it would be S/K/W. Accordingly, finding no. 13 must be reversed.

 Finding no. 15 was for expenses to Haggard in welding bracing straps on the near side of baseball cages because the Nelson stud kept them apart. As in the case of nos. 11, 12, and 13, responsibility of Mid-States and St. Joseph for this problem was not established by plaintiff. Plaintiff testified that either the architect or the project supervisor complained that the flat straps were not up against the back of the cage and ordered them redone. Haggard was not sure who was responsible for this problem but testified he felt that St. Joseph should have caught it in the shop. At best, responsibility for this expense is speculative and cannot be allowed under *Sides Const. Co. v. Arcadia Valley,* supra. Finding no. 15, therefore, must be reversed.

Findings 14, 16, 18, and 19 were made because lights were installed in the light cages before Haggard hoisted them. The damages found were based on additional expenses to Haggard resulting from the added weight. The directive to install the lights while the cages were still on the ground came from the project director, S/K/W. These added expenses, therefore, cannot be charged as flowing from the misrepresentation, and findings nos. 14, 16, 18, and 19 must be reversed.

The additional charges claimed by Haggard reflected in findings 8, 9, 10, 20, and 21 resulted from additional welding and assembly required of Haggard as a result of the misrepresentation made by Mid-States and adopted by St. Joseph. These findings in total sum $52,025.70 are affirmed.

Accordingly, the judgment is affirmed in part and reversed in part, and the cause is remanded with direction to enter judgment for plaintiff against defendant Mid-States Metal Lines, Inc., and St. Joseph Structural Steel Company in sum $52,025.70, together with interest from date of original judgment in the trial court (August 19, 1977).

All concur.