CLAYTON CENTER ASSOCIATES, a Missouri Limited Partnership by the CENTOR COMPANY, its general partner, Appellant,

v.

SCHINDLER HAUGHTON ELEVATOR CORPORATION, Appellee.

No. 83–1055.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 16, 1983.

Decided April 2, 1984.

---

Coffelt & Coffelt, P.C., Kemper R. Coffelt, Clayton, Mo., for defendant-appellee, Schindler Haughton Elevator Corp.

Thompson & Mitchell, William G. Guerri, W. Stanley Walch, Jeffrey T. Demerath, St. Louis, Mo., for plaintiff-appellant, Clayton Center Associates, a Missouri Ltd. Partnership by The Centor Co., its General Partner.

Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge and JOHN R. GIBSON, Circuit Judge.

HEANEY, Circuit Judge.

Clayton Center Associates (Clayton Center) sued Schindler Haughton Elevator Corporation (Schindler) for breach of a contract to maintain the elevators in the Chromalloy Plaza Building, which Clayton Center owns. After eight days of trial, the district court granted a directed verdict for the defendant, ruling that Clayton Center's proof of damage was too speculative to submit to the jury. We hold that the district court erred in so ruling.

**BACKGROUND**

Clayton Center Associates is a partnership which owns the Chromalloy Plaza Building in Clayton, Missouri.[1] Ever since 1973, when the building opened, Schindler had maintained the elevators in the building under what is called a "turn key maintenance contract." This contract provided that in exchange for a monthly fee (starting at $1,591 and subject to escalation based on the consumer price index), Schindler would maintain the elevator system, repairing and replacing major components as necessary. The contract provided that this arrangement would continue for a period of thirteen years.

In 1979 and 1980, Clayton Center experienced numerous problems with its elevators. Doors were opening and closing spontaneously and the elevator cars would stop without warning, would not go to the proper floors, and would fail to level properly. Tenants in the building complained of the elevator service on numerous occasions. Clayton Center became concerned about losing tenants as a result of the elevator problems. In the fall of 1980, Clayton Center's building managers met with Schindler on two occasions to advise it of the continuing problems, and to request a prompt solution. After suggesting that they might have no other option than to terminate the contract, Clayton Center finally did so on December 5, 1980.

Clayton Center then hired Miller Elevator Company (Miller) to fix and service its elevators. Miller performed its work for Clayton Center initially on a time and mate-

---

1. As this is an appeal from a directed verdict, we review the facts in the light most favorable to the nonmoving party, Clayton Center. *See*

*Mills v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 703 F.2d 305, 308 (8th Cir.1983).

rials fee basis. This arrangement suited Clayton Center, because it was at that point hesitant to enter into another long term maintenance contract. The fee arrangement suited Miller, which was hesitant to perform the necessary repairs for a fixed fee.

Before commencing the repairs, a Miller worker observed from a preliminary inspection that the elevator system's generators were dirty, the commutators were scored, brushes were too short, controllers were dirty, elevator car lights were burned out, door sills were excessively worn, car doors were flopping and not meeting properly, speeds were wrong, and the electric eyes were not working. Miller commenced its work in early December, 1980. Its employees worked on the elevators full-time.

In January, 1981, Miller notified Clayton Center that repair of the system would take longer than initially expected. Miller recommended that Clayton Center confirm its assessment of the elevators and estimate of the work remaining through an independent consultant—Lerch Bates of Denver, Colorado. Clayton Center agreed with this suggestion, and in early February, 1981, contacted that company. Eric Pankey, Regional Engineer with Lerch Bates, examined and tested the elevator system on February 9–10, 1981. He conferred with Lee Glaser, Miller's supervisor of the work at the Chromalloy Plaza. Pankey identified a long list of unsatisfactory conditions in the elevator system attributable to neglected maintenance. In his report to Clayton Center, Pankey stated that Glaser and the other Miller employees could perform the necessary repairs. He also recommended that Clayton Center enter into a maintenance contract with Miller.

Miller continued to work on the elevator system, and finally rendered it in good working order in July, 1981. One of the continuing problems had been that Schindler had used the wrong solvent on the system's contact relays, which control the motion of the elevator cars and doors. Each elevator has several hundred contact relays. Miller had repeatedly attempted to clean them, but finally concluded that they could not be successfully cleaned and would have to be replaced.

Lerch Bates performed a follow-up inspection in June, 1981, and confirmed that the system was substantially repaired. Lerch Bates also suggested a format for a long-term maintenance contract, and this served as the basis for a contract Clayton Center entered into with Miller in July, 1981. Miller's total bill to Clayton Center for the work performed from December, 1980, to July, 1981, came to some $208,000.

Clayton Center brought suit against Schindler to recover for the cost of repairing its elevator system. Schindler counterclaimed for the profits it lost due to the early termination of the contract. A jury trial began on November 29, 1982, and on December 10, 1982, the district court granted a directed verdict for defendant at the close of Clayton Center's case in chief. The court ruled that there was "no evidence before the jury to substantiate plaintiff's measure of damages." It bifurcated and deferred Schindler's counterclaim pursuant to Fed.R.Civ.P. 42(b). Clayton Center then brought this appeal.

## ANALYSIS

Clayton Center argues on appeal that it offered evidence of damage sufficient to enable the jury to fix an amount with reasonable certainty but that the trial court erroneously excluded this evidence.[2] It is clear from the transcript that plaintiff had a great degree of difficulty in presenting its case. Throughout the eight days of trial, plaintiff's questions prompted continuous objections by defendant's attorney, going primarily to the form of the questions, occasionally to lack of foundation, but frequently without a stated ground for the objection. These objections were nearly always sustained by the trial court. Consequently, plaintiff's counsel ended up

---

**2.** Clayton Center also argues that the district court interfered with the orderly progress of the trial in connection with the testimony of its expert witness. In view of our resolution of the damages issue we find it unnecessary to address this matter.

making repeated offers of proof, with the jury being excused from the courtroom each time.

The case is in federal court by virtue of diversity jurisdiction; the parties agree the case is governed by Missouri law. In Missouri, upon proving the existence of a contract and its breach, a party has made a submissible case and may at least recover nominal damages. *Sunny Baer Co. v. Slaten*, 623 S.W.2d 595, 598 (Mo.App.1981). Clayton Center certainly submitted evidence sufficient to raise a jury question as to the existence and breach of the instant turn key maintenance contract. Moreover, we think it clear that the district court granted Schindler's motion for a directed verdict only because it found the evidence of actual damages too speculative. We disagree with this finding. Based on admitted and proffered evidence, Clayton Center should have at least survived the directed verdict motion requested by Schindler, and been able to submit its case to the jury.

As with any contract case, the goal in awarding damages is to give the injured party the benefit of its bargain, that is, to place it in the position it would have enjoyed had the contract been fully performed. *Sunny Baer Co. v. Slaten, supra,* 623 S.W.2d at 597. Two alternative measures of damages are used to achieve this goal in construction or building repair contract cases, *see* Dobbs, *Remedies* § 12.-21 at 897–898 (1973). These measures are the cost of repair or completion of the contract work, or the diminution in value to the building caused by the breach. *Sunny Baer Co. v. Slaten, supra,* 623 S.W.2d at 597–598; *Hensic v. Afshari Enterprises, Inc.,* 599 S.W.2d 522, 524 (Mo.App.1980).

Although there are some references in Missouri cases indicating that the plaintiff must offer evidence under both theories to allow the factfinder to discern the lesser amount, *see, e.g., Lieber v. Bridges,* 650 S.W.2d 688, 692 (Mo.App. 1983); *DeArmon v. City of St. Louis,* 525 S.W.2d 795, 800 (Mo.App.1975), the particular facts of each case seem to govern which measure of damages is appropriate. *Hensic v. Afshari Enterprises, Inc., supra,* 599 S.W.2d at 524 & n. 4. Moreover, for contracts for the furnishing of labor or services, the usual measure under Missouri law seems to be the necessary cost of completion, and repair. *Edmonds v. Stratton,* 457 S.W.2d 228, 233 (Mo.App.1970).

Clayton Center submitted evidence concerning the cost of repairing the elevator system; it did not attempt to prove its damage by the difference between the value of the Chromalloy Plaza with a properly maintained elevator system as promised, and its value with the elevator problems they experienced. Schindler does not argue that the cost of repair is an improper measure of damages here.

Rather, Schindler contends that the evidence offered by Clayton Center to prove the cost of repairs did not establish the amount of damages with sufficient certainty. While the plaintiff is not required to prove its damage with absolute precision, it must prove the existence and amount of damage with reasonable certainty. *Sides Construction Co. v. Arcadia Valley R–II School District,* 565 S.W.2d 761, 768 (Mo.App.1978). According to the Missouri Court of Appeals, "one element of 'reasonableness' is the extent to which the party has established the damages as well as it could under the circumstances." *Id.*

Whether recovering for incomplete or faulty construction, or for neglected maintenance—the basic principle is the same. In seeking to recover the cost of rendering the property in the condition it would have been in had the contract been fully performed, a party cannot leave the jury to guess what these costs might be. The party should specify the materials required, the hours spent on the repairs, the hourly wages and the number of workers involved. It should also specify the extent of the defect which required the repair work claimed as damages. With these guidelines in mind, we turn to Clayton Center's claims for the cost of repairing its elevator system.

Clayton Center attempted to prove the cost of repairing the elevator system by offering into evidence the invoices relating to work performed by Miller from December, 1980, to July, 1981. These invoices did specify the cost of materials, the number of crew hours, and an hourly rate. Although not stated in its order, a reading of the trial transcript discloses that the district court's main frustration with this attempt at proof is that these invoices apparently included items of routine maintenance as opposed to corrective work, which Clayton Center would not be able to recover against Schindler. Clayton Center steadfastly insisted that despite its best effort, it could not separate "maintenance" from "repairs" on the face of these invoices or any back-up documents. The problem here is compounded because as a practical matter many "repairs" were essentially the performance of neglected maintenance work, and thus would not be discernible as corrective work on the invoices.

Schindler contends that the elevator problems at Chromalloy Plaza were at least in part due to factors out of its control, and therefore outside of the maintenance contract and not traceable to its breach. In particular, it argues that the building had structural defects which caused problems with heat and dust in the elevator system. Further, it argues that both a fire and a storm may have caused damage to the elevator system, and it should not be held liable for any work Miller performed relating to such damage.

■ Clayton Center attempted through its expert witness, Eric Pankey, to introduce evidence of the defects identified in the Chromalloy Plaza elevator system. Pankey wrote a report analyzing the problems in the elevator system which he discovered through his February 9–10, 1981, investigation. Clayton Center attempted without success to introduce this report; it also offered to prove that if allowed to testify, Pankey would state his opinion that 20 of the 30 defective conditions listed in his report existed as of December 5, 1980, and were traceable to Schindler's neglected maintenance. On redirect, Pankey testified that none of the 20 conditions were caused by excessive heat or dust problems in the building. Schindler's counsel successfully objected to introduction of the report, arguing there was no foundation to show that Pankey's opinion of the elevators' condition in February, '1981 was relevant to their condition on December 5, 1980. He also successfully objected to plaintiff's questions attempting to lay foundation.

We find that it was error to exclude Pankey's report as it was directly relevant to Schindler's breach of the contract and to damages. Clayton Center's proffered questions laid sufficient foundation to establish Pankey's opinion that certain conditions existing on February, 1981 would have also existed on or before December 5, 1980. Of course, Schindler is free to cross-examine or to introduce contrary evidence to impeach this opinion.

■ Finding there was admissible evidence to establish the defective conditions due to Schindler's breach, Clayton Center's remaining task was to establish the reasonable cost of repairs. Pankey's testimony contains one reference estimating the cost of repairs. On cross-examination, Schindler's counsel referred to Pankey's deposition estimating the time required to perform the necessary repairs. In response to further questioning, Pankey stated that the total estimate of 500 hours at $32 per hour, or around $20,000 could be the appropriate figure. Thus, evidence elicited by defendant on cross-examination established that the necessary cost of repairs were, at a minimum, $20,000. We note further that the trial court erred in excluding Pankey's further testimony concerning these estimates on redirect examination by plaintiff. The proffered testimony did not improperly summarize Pankey's deposition, as the court ruled, but rather directly related to the estimates brought out by defendant on cross-examination.

Clayton Center's main effort at establishing the necessary cost of repairs involved the Miller invoices, and testimony by Miller's supervisor at Chromalloy Plaza, Lee

542

Glaser. As mentioned above, Clayton Center had great difficulty in working with the Miller invoices at trial. The trial transcript indicates that Clayton Center had introduced a group of invoices which clearly included items irrelevant to the lawsuit. After working to separate these irrelevant invoices during the course of the trial, Clayton Center also could not separate "maintenance" from "repairs" on the face of the invoices or any back-up documents. It attempted to separate maintenance from corrective work by two indirect, alternative methods. Both methods were rejected by the district court. Clayton Center offered to use the monthly maintenance fee it had been paying to Schindler, which as of December, 1980 had escalated to $3,061, to establish the fair market value for elevator maintenance service at Chromalloy Plaza. Multiplying this figure by the seven months which Miller spent repairing the system rendered a figure of some $21,000 for maintenance. Subtracting this figure from Miller's total bill for that period would, Clayton Center contended, yield the amount required to correct the system from deficiencies caused by defendant's breach.

Under its second method, Clayton Center offered to separate maintenance from corrective work through Glaser's expert testimony. Glaser's proffered testimony was that normal maintenance for an elevator system like the one in question would be $22,000 for a seven month period. Again, it argues subtraction of this figure from Miller's total bill would render the proper figure for the cost of repairs.

■■■■ We hold that the second method was proper. Clayton Center established Glaser's experience in the elevator maintenance field generally, and with the particular elevator system in question. Based upon that experience, he was in a position to testify concerning the cost of normal maintenance of the system. Although the first computation method yields a similar sum for maintenance, we reject it in principle. Clayton Center assumes with this method that the contract price it bargained

with Schindler would determine the actual cost of maintaining the elevator system. Even though the contract price was subject to escalation, it is erroneous to assume that the price Clayton Center bargained with Schindler in 1973 would establish the actual cost of necessary maintenance performed by Miller in 1981. See Sunny Baer Co. v. Slaten, supra, 623 S.W.2d at 598.

■■■ Clayton Center must also affirmatively establish that the sums paid to Miller were for repair work that was necessary due to neglected maintenance, and that the price charged was reasonable. This Clayton Center was prepared to do through Glaser's testimony. Clayton Center proffered that Glaser was prepared to refer to particular invoices and back-up materials including time tickets and the machine room log, and to testify whether specific amounts for labor and materials were necessary in his opinion to restore the elevator system to a normal condition. The district court did not allow this testimony. We hold that it was relevant and admissible to prove damages directly traceable to a breach by Schindler. Glaser's proffered testimony also included evidence establishing what amounts accounted for Miller's work relating to the possible fire and storm damage. Here again, Schindler is free to counter Glaser's testimony in presenting its defense.

We thus remand the case for a new trial. On remand, Clayton Center will have the opportunity to specify the problems caused by Schindler's neglect, and to specify the cost of remedying these problems. From this record, we conclude that Pankey's expert testimony and his report from the February, 1981 investigation are admissible to establish his diagnosis of the elevator system, and the time required to perform the repairs necessitated by Schindler's breach. Or, Clayton Center may specify its cost of necessary repairs through Glaser's testimony with careful and particular reference to the Miller invoices, while subtracting his estimate for routine maintenance work unrecoverable against Schindler. Of course, Schindler is free to present to the

jury evidence which may establish that some of the repairs claimed were due to factors outside of its control and therefore outside of the maintenance contract.

In conclusion, we hold that the district court erroneously prohibited testimony which was relevant and admissible to establish Clayton Center's damages with reasonable certainty. We therefore reverse the district court's order granting Schindler a directed verdict, and remand for a new trial. The new trial will include resolution of Schindler's deferred counterclaim.