# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

## Nos. 98-1484SD, 98-1577SD
_____

Turn Key Gaming, Inc.,

     Appellant/Cross-Appellee,

v.

Oglala Sioux Tribe,

     Appellee/Cross-Appellant.

\*
\*
\*
\*
\*   On Appeal from the United
\*   States District Court
\*   for the District of South
\*   Dakota.
\*
\*
\*

_____

Submitted:  October 19, 1998

Filed:  January 4, 1999
_____

Before BOWMAN, Chief Judge, RICHARD S. ARNOLD and MORRIS SHEPPARD ARNOLD, Circuit Judges.
_____

RICHARD S. ARNOLD, Circuit Judge.

     The plaintiff, Turn Key Gaming, Inc., appeals from several rulings made by the District Court on two motions for partial summary judgment.  In both rulings the Court resolved various legal issues concerning the meaning and effect of a management contract between the parties.  At the close of its second Memorandum Opinion, the District Court entered a "judgment of dismissal, together with costs" against Turn Key, leaving only the Tribe's counterclaims remaining.  Subsequently, the District Court

certified its ruling as final under Rule 54(b).[1]  Although we agree with the Court's conclusions, we hold that Turn Key's entire complaint should not have been dismissed, and remand for further proceedings.

At the center of this case is a Management Agreement executed by Turn Key and the Oglala Sioux Tribe on November 30, 1994, and approved by the Chairman of the National Indian Gaming Commission (NIGC) on December 7, 1995.  Under the terms of this Agreement, Turn Key was to develop, finance, construct, and manage a gaming facility on Oglala Sioux tribal lands to be known as the Prairie Wind Casino.  All costs of constructing and equipping the project were to be advanced by Turn Key, and repaid by the Tribe out of revenues from operations according to a set formula.  According to Turn Key, the project experienced significant cost overruns because of the protracted process of receiving NIGC approval, inflation, and the added expenses of opening temporary facilities.  Turn Key insists that these overruns were discussed with Tribe officials, and that in order to avoid the risk of further delays, it was orally agreed that the parties would modify the Agreement after receiving NIGC approval.  By the time the Agreement finally received NIGC approval on December 7, 1995, Turn Key had already spent a considerable amount of money, about $2.7 million, on the project.  In June of 1996, Turn Key sent a change order to the Tribe requesting that it approve an increase in construction costs.  The Tribe refused, and Turn Key ceased work on the project.  The Tribe then declared Turn Key in default, and, after a time, terminated the Agreement.  Turn Key filed suit alleging breach of contract and unjust enrichment.  The Tribe counterclaimed for breach of contract and breach of fiduciary duty.

The Indian Gaming Regulatory Act of 1988 provided a statutory basis for the operation and regulation of Indian gaming, and established the National Indian Gaming Commission (NIGC) to oversee Indian gaming.  25 U.S.C. §§ 2701-21.  Among other things, the Act permits tribes to enter into management contracts for the operation and

---

[1]It is this ruling which forms the basis of the Tribe's cross-appeal.

management of gaming facilities, subject to the approval of such contracts by the Chairman of the NIGC. 25 U.S.C. § 2711. A contract cannot receive approval from the Chairman unless it provides certain minimal protections for the tribe. Id. Some requirements are codified in the Act itself, and others are set out in the accompanying regulations. See id.; 25 C.F.R. §§ 531.1-533.7. A few of those requirements are relevant here. First, the contract must provide for an "agreed ceiling for the repayment of development and construction costs." 25 U.S.C. § 2711(b)(4); see 25 C.F.R. § 531.1(g). Second, the contract must contain a "representation that the contract as submitted . . . is the entirety of the agreement among the parties." 25 C.F.R. § 533.3(a)(2). In addition, the regulations mandate that any management contract that does not receive approval is void, and that any attempted modification of an approved contract that does not comply with the regulations and does not receive approval, is also void. 25 C.F.R. §§ 533.7, 535.1(f).

In keeping with these requirements, the management contract (hereinafter "Agreement") in this case stated that it encompassed the entire agreement between the parties with respect to the subject matter thereof and that there were no other collateral agreements or understandings except those contained therein. The Agreement provided that it could not be changed orally, but only by an instrument in writing signed by both parties and submitted by the Tribe for written approval to the NIGC. The Agreement also provided that "the maximum agreed ceiling for development and construction cost of all construction and equipping of the Project shall not exceed the aggregate sum of $4,000,000."

While awaiting final NIGC approval of the Agreement, the parties entered into several "interim agreements" which allowed gaming operations to begin in temporary facilities erected on the site. There was a Rental Agreement, whereby Turn Key agreed to provide the Tribe certain gaming equipment and other personal property, as well as an Employee Agreement between Wayne Barber, a tribe member and officer of Turn Key, and the Tribe, in which the Tribe employed Barber to manage the temporary

gaming facility until the Agreement received NIGC approval.  Both interim agreements stated that they would end upon approval of the main Agreement by the NIGC, and that thereafter the main Agreement would govern all rights and obligations of the parties.  Turn Key also asserts that there was an oral agreement with Tribe officials to modify the $4,000,000 construction cost ceiling after it became obvious that this amount would not adequately cover the full cost of construction.

On appeal, Turn Key first argues that it was error for the District Court to refuse to consider the content and effect of these interim agreements.  Turn Key claims that the common law of South Dakota should control the issue of whether it is proper for the Court to look to these other agreements in order to determine the intent of the parties.  Although this may be the correct approach in ordinary contract disputes, in the context of Indian gaming the directives of Congress, when made apparent, must control.  As the Court below pointed out, the integration clause, which is required by the Act and regulations, prevents consideration of any prior or contemporaneous agreements; and the no-oral-modification clause and the regulation's requirements for modifying management contracts preclude consideration of any subsequent agreements not approved by the Chairman of NIGC.  Accordingly, these other agreements can have no effect with respect  to any of the subject matter encompassed by the Management Agreement.

Turn Key next argues that it was error for the District Court to conclude that the ceiling on construction costs applied only to the amount the Tribe is required to repay, and not to the amount Turn Key is required to invest in the project.  Turn Key claims that this ruling improperly shifts the risk of cost overruns to it and is contrary to the plain language of the Agreement and the intention of the parties.

As noted above, the Act and regulations require that before the Chairman of the NIGC may approve a management contract, it must include an "agreed ceiling for the repayment of development and construction costs."  25 U.S.C. § 2711(b)(4); see 25

C.F.R. § 531.1(g). The ceiling provision in this case is mentioned several times in the Agreement. First, section 3.3 states:

> No Agreement; Reimbursement of Manager. If an Agreement is not approved, the Tribe specifically agrees to reimburse the Manager for the costs of construction of any building and related costs . . . to the extent as provided by § 11.2 herein. An amount of $4,000,000 is the ceiling agreed upon in § 4.1(a)(1) for development costs for the Project. The parties acknowledge that $4,000,000 is the maximum amount that will be invested in the Project and to maximize financial returns to the Tribe, Manager will endeavor to spend less on development.

The provision is also mentioned in § 4.1(a), which provides in part:

> The costs of all such construction and equipping of the Project shall be advanced by Manager as its investment in the project, and repaid as a Construction and Asset Acquisition Payment as contemplated in § 6.4(f). The parties agree that the maximum agreed ceiling for development and construction cost of all construction and equipping of the Project shall not exceed the aggregate sum of $4,000,000.

The third reference to the construction ceiling is found in § 6.4(f), which provides for the creation of an "Construction and Asset Acquisition Account" to include all of the expenditures by Turn Key in constructing, furnishing, and equipping the project. This section goes on to direct that the balance of this account "as specified and limited in § 4, . . . shall be repaid to Manager . . . from the Manager's fee and the Tribe's share as provided at § 6.5(b), and in the proportions set forth therein."

Turn Key insists that the clear import of these clauses indicates that the ceiling was meant to apply both to the amount the Tribe would be required to repay and the amount Turn Key would be required to invest. We do not agree. Such a construction

is contrary both to the reason the Act requires a ceiling provision -- for the protection of the Tribe -- and the obvious reason for placing a "limit" on Turn Key's "investment." In our view, to the extent that the above clauses can be read as limiting Turn Key's investment, it is still a limit that is imposed for the protection of the Tribe. As each clause indicates, the more Turn Key "invested" in the project, the more the Tribe would have to pay back. This is why § 3.3 of the Agreement states that in order to "maximize financial returns to the Tribe," Turn Key "would endeavor to spend less" on the project. Turn Key has not pointed to any other portions of the Agreement, besides those discussed above, which would support its position, and we refuse to convolute the Agreement to provide a protection to Turn Key that was not bargained for.

Turn Key also appeals the dismissal of its complaint at the conclusion of the District Court's Memorandum Opinion granting the Tribe's second motion for partial summary judgment. Turn Key argues that its claims under Section 11.2(a) of the Agreement, as well as its claims for unjust enrichment, should have survived. Section 11.2(a) of the Agreement provides, "if termination of this Agreement occurs for any reason prior to the end of the Term, all costs which were incurred by [Turn Key] in the performance of this Agreement and which have not been repaid as provided in [the formula] shall be repaid to [Turn Key]." Turn Key's Sixth Claim for Relief avers that the Tribe owes it approximately $2.3 million for costs incurred prior to termination. In the alternative, Turn Key has also claimed unjust enrichment under its Fourteenth Claim for Relief, based on the enhanced value of the Tribe's property due to the expenditures made by Turn Key on the project. These claims were not addressed in the District Court's Memorandum Opinion, and none of the legal conclusions reached in that opinion would necessarily prevent these claims from going forward. We therefore reverse the dismissal of Turn Key's claims under Section 11.2(a) of the Agreement and for unjust enrichment.

Finally, we hold that the District Court did not abuse its discretion in certifying

its judgment as final under Rule 54(b), and we therefore affirm on the Tribe's cross-appeal on this issue.

On remand, the case should go forward on Turn Key's remaining claims, as well as on the Tribe's counterclaim.

It is so ordered.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.