# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1094

_____

Missouri River Services, Inc.,
a Delaware Corporation,

        Appellee,

    v.

Omaha Tribe of Nebraska,
a Federally Recognized Indian Tribe,

        Appellant.

\* \* \* \* \* \* \* \* \* \* \* \*

Appeal from the United States District
Court for the District of Nebraska.

_____

Submitted:  October 23, 2000

Filed:  September 12, 2001

_____

Before McMILLIAN, ROSS and HANSEN, Circuit Judges.

_____

ROSS, Circuit Judge.

The Omaha Tribe of Nebraska ("the Tribe") appeals from a final judgment entered in the district court refusing to vacate or modify an arbitration award in favor of Missouri River Services, Inc. ("MRS").  The award directed the Tribe to pay $6,206,358.00, plus interest, to MRS for its capital investment in an unsuccessful casino project on the Tribe's lands in Nebraska.  For reversal, the Tribe argues that the judgment violates its sovereign immunity.  The Tribe also argues that the district court erred because the award failed to draw its essence from the agreement between the

parties and is contrary to public policy. The Tribe especially challenges the arbitrator's decision directing that the award be satisfied from profits generated by a casino operating on the Tribe's lands in Iowa. For the reasons stated below, we reverse and remand.

## BACKGROUND

On December 10, 1987, the Tribe and Steicher & Sons, later renamed MRS, entered into an agreement in which the Tribe gave MRS the exclusive right to construct and operate a gaming facility on the Tribe's lands. The agreement provided that the facility would be "suitable for the purpose of operating highstakes bingo and other gaming activities, as well as complementary businesses," collectively referred to as the "Enterprise." Under the agreement, MRS was responsible for securing the necessary funds to construct the casino, and "its capital investment would be repaid from revenues of the Enterprise."

In the event of disputes arising under the agreement, Article XI provided for binding arbitration. Article XI also provided for a waiver of the Tribe's sovereign immunity as follows:

> [The Tribe] hereby waives its sovereign immunity from suit with respect to any disputes arising under this Agreement, but only to the extent of all real and personal property purchased pursuant to this Agreement, and [the Tribe] further agrees that judgment upon any arbitration award may be entered in any court having jurisdiction thereof . . .. Any monetary judgment or award may be satisfied only out of such property and/or out of [the Tribe's] share of any future [net operating profits] under this Agreement.

Pursuant to Article VI of the agreement and 25 U.S.C. § 81, the parties submitted the agreement to the Bureau of Indian Affairs ("BIA") for approval. Article VI provided that MRS was "not obligated to proceed with its obligations herein until such approval shall have been obtained." As relevant here, § 81 provided that an

agreement with an Indian tribe "for the payment or delivery of any money . . . or for the granting or procuring any privilege . . . in consideration of services for said Indians relative to their lands . . . shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it." Section 81 further provided: "All contracts or agreements made in violation of this section shall be null and void."

By memorandum of April 7, 1986, the BIA requested that the parties make certain changes to the agreement. To obtain the necessary approval, the parties amended the agreement to add Article XIX, which stated: the "Location of the Enterprise" was "Thurston County, Nebraska" and Article XX, which stated: "The Enterprise shall conduct Bingo and Bingo-related activities." On February 12, 1988, the BIA approved the agreement, as amended (the "Agreement").

In October 1988, Congress passed the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et seq. ("IGRA"), which requires that all contracts dealing with gaming on Indian land be approved by the chairperson of the National Indian Gaming Commission ("NIGC"). IGRA defines three classes of gaming, with Class I being social games, Class II being bingo and similar games, and Class III being all other forms of gambling. 25 U.S.C. § 2703(6)-(8). IGRA permits Class III gaming on Indian lands, provided that such activities are "located in a State that permits such gaming," and are "conducted in conformance with a Tribal-State compact." 25 U.S.C. § 2710(d)(1). Although MRS knew of the pending passage of the IGRA, knew that Nebraska prohibited Class III gaming, and a facility without Class III gaming would not be economically feasible, it nonetheless had begun construction of a Class III gaming casino, assuming that it would be grandfathered in under the IGRA.

In November 1988, MRS opened the facility for bingo and announced a full casino with Class III gaming would open on December 31, 1988. On December 30, 1988, the United States Attorney for the District of Nebraska informed the parties that they could not conduct Class III gaming, threatening prosecution. On January 5, 1989,

MRS sought federal judicial relief, asserting that the casino fell within the scope of the grandfather clause of the IGRA. The district court disagreed and denied relief, and MRS did not appeal. As MRS believed, the bingo operation was not financially feasible. In September 1989, MRS closed the casino, after having invested in excess of six million dollars in capital and operating expenditures.

In October 1989, the Tribe and MRS executed a "Second Amendment to Agreement," which was never approved by the BIA nor the NIGC. The amendment stated that although the parties had intended that the Enterprise include Class III gaming, the Enterprise had ceased operations due to the passage of the IGRA and the inability of the Tribe to reach a compact with the State of Nebraska to permit Class III gaming. In order that the Tribe could conduct gaming at other locations within its lands, MRS agreed to waive the exclusivity clause of the Agreement. In 1991, the Tribe contracted with another company to open and operate a casino to conduct Class III gaming on the Tribe's lands in Onawa, Iowa. The Tribe and the State of Iowa entered into the necessary tribal-state compact. The casino opened in approximately July 1992. According to MRS, the casino generated more than $9 million in profits in the first year, most of which resulted from Class III gaming.

MRS demanded arbitration, seeking, among other things, reimbursement of its capital investment in the Nebraska facility. The Tribe resisted, asserting that MRS had not exhausted tribal court remedies. MRS filed a state court suit, seeking to enjoin the tribal court proceedings. The Tribe removed the suit to federal district court, which eventually held that exhaustion of tribal court remedies was not required. In pre-hearing submissions to the arbitrator, each party accused the other of having breached the Agreement. The Tribe also argued that the Agreement limited MRS's "right to recover its capital investment to the extent that there were any operating profits from the bingo operation or to the property purchased pursuant to the Agreement." The arbitrator found in favor of MRS on its reimbursement claim, awarding it $6,206,358.00 for its capital investment, plus interest. The arbitrator directed that

"[t]he award is to be paid from the Enterprise, which includes all gaming operations on the reservation of the Omaha Tribe of Nebraska (the Property), including specifically the gaming operation at Onawa, Iowa; or from any other funds [the Tribe] may elect to use."

MRS filed a motion in the district court to confirm the award. The Tribe filed a motion to vacate, or in the alternative to modify the award. In confirming the award, the district court rejected the Tribe's argument that entry of the award would violate its sovereign immunity. The court noted that a waiver of immunity must be clear and unambiguous, that a court must construe a waiver narrowly, and that the Tribe's waiver of immunity was limited. However, the court believed the arbitrator had determined the scope of the waiver and that "it [wa]s not at liberty to disturb that interpretation." The court also rejected the Tribe's arguments that the arbitration award failed to draw its essence from the agreement.

## DISCUSSION
### Waiver of Tribal Immunity
We first consider the Tribe's arguments concerning waiver of immunity from suit. The Tribe argues that the district court erred in deferring to the arbitrator's interpretation of the scope of its waiver. Assuming the arbitrator attempted to interpret the scope of the waiver of immunity, which we doubt, we agree with the Tribe that the district court erred in believing it could not disturb her interpretation. Because a waiver of immunity from suit implicates jurisdictional concerns, a court must satisfy itself that jurisdiction exists. See Jones v. United States, 255 F.3d 507, 511 (8th Cir. 2001). Contrary to MRS' suggestion, the Tribe's attorney could not expand the scope of the Tribe's waiver from suit in the pre-hearing submission to the arbitrator. See United States v. United States Fidelity & Guar. Co., 309 U.S. 506, 513 (1940) ("immunity cannot be waived by [tribal] officials"). In any event, we review de novo the question of whether the Tribe waived its sovereign immunity. Rosebud Sioux Tribe v. Val-U Constr. Co., 50 F.3d 560, 562 (8th Cir.), cert. denied, 516 U.S. 819 (1995).

It is well settled "that Indian tribes possess the same common-law immunity from suit traditionally enjoyed by sovereign powers." Val-U Constr. Co. v. Rosebud Sioux Tribe, 146 F.3d 573, 576 (8th Cir. 1998). The Supreme Court recently reaffirmed that a tribe may waive its immunity, but "a tribe's waiver must be 'clear.'" C & L Enter., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla., 121 S. Ct. 1589, 1594 (2001) (quoting Oklahoma Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla., 498 U.S. 505, 509 (1991)). In that case, an Indian tribe had expressly agreed to arbitration of contractual disputes and to entry of judgment upon the award in a court having jurisdiction thereof. Although the tribe had not used "magic words," see Rosebud Sioux Tribe, 50 F.3d at 563, the Court held that it had waived immunity "with the requisite clarity." 121 S. Ct. at 1594.

In this case, the Tribe did use "magic words" to waive its immunity. However, the critical question is not whether the Tribe waived immunity, but rather, "the extent to which that immunity was waived." Namekagon Dev. Co. v. Bois Forte Res. Hous. Auth., 517 F.2d 508, 510 (8th Cir. 1975). Because a waiver of immunity "'is altogether voluntary on the part of [a tribe], it follows that [a tribe] may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted.'" American Indian Agric. Credit Consortium, Inc. v. Standing Rock Sioux Tribe, 780 F.2d 1374, 1378 (8th Cir. 1985) (quoting Beers v. Arkansas, 61 U.S. 527, 529 (1857)). In addition, if a tribe "does consent to suit, any conditional limitation it imposes on that consent must be strictly construed and applied." Namekagon Dev. Co., 517 F.2d at 509.

As the district court noted, the Tribe's waiver of immunity was expressly limited. Although the Tribe consented that "judgment upon any arbitration award may be entered in any court having jurisdiction thereof," it placed limitations on the waiver by providing that "[a]ny monetary judgment or award may be satisfied only out of such property and/or out of [the Tribe's] share of any future [net operating profits] under this Agreement." Id. The Tribe argues because that the only enforceable agreement before

-6-

the district court was the Agreement approved by the BIA, which unambiguously restricted the location of the Enterprise to Thurston County, Nebraska, and gaming activities to bingo and bingo-related activities, its waiver of immunity only extended to entry of a judgment to be satisfied by property or profits from the Nebraska facility.

MRS argues that in determining the scope of the Tribe's waiver, we should consider the intent of the parties that the Enterprise would include Class III gaming anywhere on the Tribe's lands, as was expressed in the December 1987 agreement and the so-called second amendment. We disagree. This case is similar to Turn Key Gaming, Inc. v. Oglala Sioux Tribe, 164 F.3d 1092 (8th Cir. 1999). In that case, a company had executed a contract with an Indian tribe to construct and manage a gaming facility on the tribe's land. The contract was subject to the IGRA. While the parties were awaiting approval from the NIGC, they entered into interim agreements. They also attempted to orally modify the contract's approved ceiling on construction costs. When disputes arose, the company argued that it was "proper . . . to look to these other agreements in order to determine the intent of the parties." Id. at 1094. This court rejected the argument, holding that "these other agreements [could] have no effect with respect to any of the subject matter encompassed" by the approved contract. Id. at 1095. We stated that no matter the "correct approach in ordinary contract disputes, in the context of Indian gaming the directives of Congress, when made apparent, must control." Id. at 1094. In the context of the IGRA, we made clear that "any management contract that does not receive approval is void, and that any attempted modification of an approved contract that does not . . . receive approval, is also void." Id. (citing 25 C.F.R. §§ 533.7, 535.1(f)).[1]

---

[1]Section 533.7 provides that "[m]anagement contracts . . . that have not been approved by the Secretary of the Interior or the [NIGC] Chairman . . . are void." Section 535.1 provides that "[m]odifications that have not been approved by the Chairman . . . are void."

In this case, the parties do not dispute that the December 1987 agreement was subject to approval by the BIA as required by 25 U.S.C. § 81,[2] and that any agreement that did not have such approval is void.[3] In addition, MRS admits that although the second amendment was submitted to the NIGC, it was not approved. Although in the initial agreement the parties may have intended that MRS would be able to conduct Class III gaming on the Tribe's land in Iowa, the BIA did not approve that agreement. To obtain the necessary approval, the parties were required to amend the agreement. As approved, the Agreement unambiguously restricted the "Location of the Enterprise" to "Thurston County, Nebraska" and "Gaming Activities" to "Bingo and Bingo-related activities." By the express terms of the only enforceable, valid agreement before the court, the Tribe's waiver of immunity was limited to entry of a judgment and execution thereon only as to property or profits from the Nebraska bingo facility. See Namekagon Dev. Co., 517 F.2d at 510 (tribe waived immunity from levy and execution, but only as to certain specified funds).

_____

[2]In United States v. Turn Key Gaming, Inc., 2001 WL 921358, No. 00-3615, (8th Cir. Aug. 16, 2001), this court considered the scope of 25 U.S.C. § 81. The court held that because a rental agreement and an employment agreement were not "relative to" Indian lands, they were not subject to the statute. Id., at *7. However, we noted that cases had held that exclusive contracts to construct and manage a gaming facility on Indian lands were subject to the statute. Id., at *5-6 (citing Barona Grp. of the Captain Grande Band of Mission Indians v. American Mgmt. & Amusement, Inc., 840 F.2d 1394, 1403 (9th Cir. 1987); Winnebago Bus. Comm. v. Koberstein, 762 F.2d 613, 614 (7th Cir. 1985)).

[3]As previously noted, at the time relevant to this appeal, § 81 provided that an agreement "shall bear the approval of the Secretary of the Interior . . . indorsed upon it" and that "[a]ll contracts or agreements made in violation of this section shall be null and void." In 2000, Congress reworded 25 U.S.C. § 81. In relevant part, the section now reads: "No agreement or contract with an Indian tribe . . . shall be valid unless that agreement or contract bears the approval of the Secretary of the Interior or a designee of the Secretary."

On appeal MRS argues that it could have conducted Class III gaming under the Agreement because the BIA-approved term "bingo and bingo-related" activities was broad enough to permit it to conduct Class III gaming. That argument is frivolous. MRS admitted in the so-called second amendment that it could not conduct Class III gaming in the Nebraska facility in view of the IGRA. It was fortunate that the parties did not attempt to violate the law. We note the saga of the Santee Sioux Tribe of Nebraska. Despite inability to reach a compact with the State of Nebraska, the Santee Sioux Tribe opened a Class III gaming casino on its lands in Nebraska. The chairman of the NIGC issued a closure order, noting the casino was operating in violation of the IGRA. We held that the district court had jurisdiction to enforce the closure order, noting that the Tribe's gaming activities violated the IGRA because they were "being conducted in contravention of Nebraska law." United States v. Santee Sioux Tribe of Neb., 135 F.3d 558, 563-64 (8th Cir.), cert. denied, 525 U.S. 813 (1998). After the tribe refused to comply with a district court injunction ordering closure, this court held that the tribe and tribal council members should be held in contempt and that twenty-three of the tribe's bank accounts were subject to garnishment. United States v. Santee Sioux Tribe of Neb., 254 F.3d 728, 734-36 (8th Cir. 2001).

Arbitration Award

We now turn to the Tribe's arguments concerning the arbitration award. Unlike our review of a waiver of sovereign immunity, our review of an arbitration award is very limited. Major League Baseball Players Ass'n v. Garvey, 121 S. Ct. 1724, 1728 (2001). Among other things, the Federal Arbitration Act, 9 U.S.C. § 10(a) provides for vacation of an award if an arbitrator exceeds the scope of her authority. In addition, an arbitration "'award will [] be set aside where it is completely irrational or evidences a manifest disregard for the law.'" Hoffman v. Cargill Inc., 236 F.3d 458, 461 (8th Cir. 2001) (quoting Val-U Constr. Co., 146 F.3d at 578). An arbitration award is "irrational where it fails to draw its essence from the agreement." Id. at 462. An award "manifests disregard for the law where the arbitrators clearly identify the applicable, governing law and then proceed to ignore it." Id.

However, "[a]lthough the arbitrator's authority is broad, it is not unlimited." Trailmobile Trailer, LLC v. Int'l Union of Elec. Workers, 223 F.3d 744, 747 (8th Cir. 2000). It is well-established that "[t]he arbitrator 'may interpret ambiguous language,' but he may not, however, 'disregard or modify unambiguous contract provisions.'" Osceola County Rural Water Sys., Inc. v. Subsurfco, Inc., 914 F.2d 1072, 1075 (8th Cir. 1990) (quoting Inter-City Gas Corp. v. Boise Cascade Corp., 845 F.2d 184, 187 (8th Cir. 1988)). In other words, "[i]f the arbitrator 'interprets unambiguous language in any way different from its plain meaning, [the arbitrator] amends or alters the agreement and acts without authority.'" Id. (quoting Inter-City Gas Corp., 845 F.2d at 187).

Even under this limited review, we find that the award failed to draw its essence from the Agreement. Because "contracts often lack explicit provisions for specific kinds of remedies[,]" it falls to the arbitrator to devise one. Amalgamated Transit Union, Local No. 1498 v. Jefferson Partners, 229 F.3d 1198, 1201 (8th Cir. 2000). However, the Agreement in this case expressly provided that an award could only be satisfied from property or profits under it. See Namekagon Dev. Co., 517 F.2d at 510. Again, the only valid agreement before the arbitrator was the Agreement approved by the BIA, which clearly restricted the location of the Enterprise to Thurston County, Nebraska, and gaming to bingo and bingo-related activities. The arbitrator was not free to disregard this unambiguous language and craft her own remedy. Compare Jefferson Partners, 229 F.3d at 1201 (upholding arbitrator's choice of remedy because "[n]othing in the contract prohibits this choice") with Coast Trading Co. v. Pac. Molasses Co., 681 F.2d 1195, 1198 (9th Cir. 1982) (vacating "arbitration award as being contrary to remedies provided in the contract" and rejecting argument that post-dispute submission modified terms of contract).

Because the BIA-required limitations on location and gaming are clear and unambiguous, contrary to MRS' argument, the contractual language cannot reasonably be construed to include proceeds generated under a different agreement the Tribe had

executed with a different party to conduct Class III gaming in a different state. To the contrary, "[t]he arbitrator's decision does not draw its essence from the contract because it is expressly contrary to the terms of the agreement." Int'l Paper Co. v. United Paperworkers Int'l Union, 215 F.3d 815, 818 n.1 (8th Cir. 2000). Simply put, "[t]he arbitrator did not interpret the contract, [s]he rewrote it" by eliminating the geographical limitation to "Thurston County, Nebraska" and the gaming limitation to bingo and bingo-related activities. Id. In so doing, we believe that she effectively overrode the policies behind § 81 and the IGRA, which are to protect Indian tribes and to promote their economic development. See Turn Key, 169 F.3d at 1095 (IGRA); Ringsred v. City of Duluth, 828 F.2d 1305, 1308 (8th Cir. 1987) (§ 81).

The Tribe also challenges other findings of the arbitrator. However, the Tribe has not demonstrated that these findings are totally irrational or manifest a disregard for the law. See Hoffman, 236 F.3d at 461-62.

In sum, we hold that the district court erred because the Agreement, as approved by the BIA, does not permit satisfaction of a monetary award from profits and proceeds of the Iowa casino. Thus, the judgment in favor of MRS should be strictly limited, as the Agreement provides, to profits of and property purchased for the Nebraska facility.

Accordingly, we reverse the judgment of the district court and remand for further proceedings not inconsistent with this opinion.

A true copy.


Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-11-