# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-2957SD

_____

| | | |
|---|---|---|
| Turn Key Gaming, Inc., | * | |
| | * | |
| Appellant, | * | |
| | * | On Appeal from the United |
| | * | States District Court |
| v. | * | for the District of |
| | * | South Dakota. |
| | * | |
| Oglala Sioux Tribe, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:  October 7, 2002
Filed:  December 27, 2002

_____

Before BOWMAN,  RICHARD S. ARNOLD, and LOKEN, Circuit Judges.

_____

RICHARD S. ARNOLD, Circuit Judge.

Turn Key Gaming promised to build a casino for the Oglala Sioux Tribe but could not keep the project within its budget.  Turn Key stopped construction when the Tribe refused to modify their contract.  Turn Key filed suit against the Tribe to resolve the parties' dispute over the costs of a temporary casino and the incomplete

permanent casino. The District Court[1] found in favor of the Tribe and awarded it a net amount of $336,343.73 in damages. Turn Key appealed. We hold that the District Court was correct in using the cost of completion of the permanent casino as the measure of damages for the breach of contract and awarding interest on the judgment. The District Court did not clearly err in giving more credence to some pieces of evidence than it did to others. Further, the Court properly held that the Tribe's sovereign immunity prevents Turn Key from bringing claims in a federal court regarding the temporary casino. We affirm the decision of the District Court in all respects.

I.

Turn Key Gaming and the Oglala Sioux Tribe negotiated a contract for Turn Key to build and operate a casino for the Tribe. Turn Key was to manage the casino for five years in return for a share of the casino's profits after deducting the cost of building the casino. The contract was submitted to the National Indian Gaming Commission in late November of 1994 for approval. The Management Agreement was approved by the Commission a year later. Pending approval of the Management Agreement, the Tribe and Turn Key operated a temporary casino on tribal land under a Rental Agreement in which Turn Key provided temporary facilities, equipment, and support in exchange for dividing casino profits with the Tribe.

After approval of the Management Agreement, Turn Key, using Mid-West Construction Management Services, began to build the permanent casino. Under the Agreement, the Tribe was liable only for the first $4,000,000 in construction costs. Turn Key realized that the project was going to cost $1,300,000 more than that, and tried to get the Tribe voluntarily to increase its liability. The Tribe refused to alter the

---

[1]The Hon. Richard H. Battey, United States District Judge for the District of South Dakota.

Management Agreement. Turn Key refused to continue construction, and the Tribe announced that it was treating the contract as broken. It seized the temporary casino to operate on its own. Turn Key sued the Tribe to recover its construction costs, and the Tribe counterclaimed for the damages it suffered because of Turn Key's breach.

The District Court granted summary judgment for the Tribe. Turn Key appealed to this Court. On appeal, we affirmed for the most part. We held that Turn Key had committed a breach of the Management Agreement by refusing to complete the permanent casino for the agreed-upon price of $4,000,000. In our view, however, the District Court had failed to address certain of Turn Key's claims, specifically that it was entitled to reimbursement of certain costs either under the Management Agreement or on an unjust-enrichment theory. The Tribe's counterclaim also remained to be decided. We remanded the case for the District Court to consider these remaining issues. Turn Key Gaming, Inc. v. Oglala Sioux Tribe, 164 F.3d 1092, 1096 (8th Cir. 1999).

After a three-day bench trial on remand, the District Court awarded breach-of-contract damages to both parties. The Tribe was awarded $1,973,002.32, and Turn Key was awarded $1,745,658.87. The District Court declined to award any damages arising out of opening or operating the temporary casino, on the ground that those expenses were incurred under a separate contract, as to which the Tribe had not waived sovereign immunity. Ultimately, the Tribe netted $336,000 in damages and prejudgment interest. Turn Key appealed to this Court.

II.

The principal legal issue presented, and the one we discuss first, is the measure of damages properly applied on the Tribe's counterclaim. It will be recalled that the counterclaim sought damages for Turn Key's breach of the Management Agreement. The breach occurred before construction was completed. Under the approach taken

-3-

by the District Court, Turn Key's damages would be the amount of money required to complete the construction according to the specifications in the Management Agreement, less an adjustment for the $4,000,000 ceiling contained in that agreement. The District Court computed that amount at $1,973,002.32. Turn Key argues that a significant fact was omitted in the District Court's analysis. If no breach had occurred, the permanent facility would have been completed at Turn Key's expense, but Turn Key would also have been entitled to manage the facility for a period of time, and to receive for its services a fee amounting to 30 per cent. of net revenues. But because of the breach, the Tribe took over the casino (actually the temporary facility) and operated it for its own account. It did not have to pay Turn Key's management fee. This benefit to the Tribe, in the form of a reduced expense, should have been allowed for in the computation of the Tribe's damages. On this view, the damages would have been $1,973,002.32, less the amount of the manager's fee that the Tribe did not have to pay.

The purpose of contract damages is to put the injured party in the same position it would have occupied if there had been no breach. Clayton Center Associates v. Schindler Houghton Elevator Corp., 731 F.2d 536, 540 (8th Cir. 1984). The District Court believed that its computation did exactly that. The Court said:

> 23. Because of the breach of the Management Agreement, plaintiff is not entitled to a credit relating to the 30% manager's fee. In addition, even if plaintiff was entitled to this credit, the Court finds its calculation to be speculative. Furthermore, the credit would not account for the costs incurred by defendant in assuming the duties of the manager.

Turn Key Gaming, Inc. v. Oglala Sioux Tribe, CIV. 96-5084 (D.S.D., opinion filed July 13, 2001), p. 6.

We have no fault to find with this approach. It contains no error of law, and no clearly erroneous finding of fact. It was Turn Key's breach in the first place that prevented performance of the contract, including Turn Key's management of the permanent facility, from going forward. In addition, Turn Key does not dispute the District Court's finding that calculation of the amount that might be saved by the Tribe is "speculative." Instead, Turn Key takes the position that the burden of proof was on the Tribe to show all elements of damage, including the amount of any credit or offset that Turn Key might be entitled to in consequence of losing its manager's fee. We cannot agree with this contention. Whether or not the manager's fee is properly characterized, in technical pleading terms, as a set-off or affirmative defense, we hold it was not unfair, under the circumstances of this case, for the District Court to rely, in part, upon the speculative nature of this item when deciding not to reduce the recovery that the Tribe was otherwise entitled to for breach of the construction contract.

In short, we agree with the District Court's decision to award the Tribe, on its counterclaim, $1,973,002.32.

### III.

We now turn to the issues that Turn Key raises with respect to the award made to it on its own complaint. As we have noted, the District Court held that Turn Key was entitled, on account of various items detailed in its complaint and evidence, including some credits, to an award of $1,745,658.87 (to be offset, of course, against the award to the Tribe on its counterclaim). Turn Key argues that the award made to it on its complaint was too low for several reasons. We discuss them in turn.

1. The District Court awarded Turn Key $1,076,858.77 in total construction costs in place at the time of the breach. Turn Key's own evidence, if believed, would have justified a higher award. The District Court held that "plaintiff's accounting of

the construction costs expended on the permanent facility [is] not credible . . .." District Court opinion, supra, p. 3. This finding was based partly on the testimony of Steve Burgess, a civil engineer called as a witness by the Tribe. According to the District Court, Mr. Burgess's "testimony on the estimated construction costs expended on the permanent facility at the time of breach was highly credible." Ibid. In addition, the District Court was critical of Turn Key for submitting certain marked-up subcontractors' bills to the Tribe, which the District Court referred to as "labor surcharges." Ibid. Turn Key argues that there was nothing wrong with the surcharges, that they represented amounts actually paid out by Turn Key to subcontractors, and therefore legitimately passed on to the Tribe. The Tribe argues, among other things, that the bills were in fact marked up by Turn Key, not its subcontractor, and that Turn Key never paid the marked-up amount to the subcontractor. In our view, this dispute is immaterial. It was the District Court's view that the occurrence of mark-ups supported its finding that the costs claimed by Turn Key were not entirely reasonable.

This is a pure question of fact. It turns in part on the District Court's assessment of live witnesses. This assessment is virtually unreviewable. We see no clear error here.

2.      Turn Key next argues that the District Court erred in failing to award it certain expenses incurred in acquiring and directing the temporary gaming facility. The amount involved in this claim is $518,231.22. According to Turn Key, these expenses were properly recoverable under the Management Agreement, because the temporary gaming facility, in connection with which these expenses were incurred, was used by the parties in performance of the Management Agreement after the Agreement's approval by the Chairman of the National Indian Gaming Commission, and before the breach of contract. Accordingly, Turn Key says, this amount is recoverable under § 11.2 of the Management Agreement, which provides, in pertinent part, that "all costs which were incurred by Manager in the performance of this

Agreement . . . shall be repaid to Manager . . ..” Management Agreement § 11.2(a), set forth at page 17 of Appellant's Addendum.

The District Court rejected this argument, finding that “[t]he costs associated with the construction and maintenance of the temporary facility were not related to the performance of the Management Agreement.” District Court opinion, supra, p. 3. The Tribe argues that this is a question of fact, and that the District Court's finding is not clearly erroneous. Turn Key responds that the issue turns on a construction of the relevant documents, including the Management Agreement itself and the Rental Agreement which preceded it. The interpretation of written contracts, Turn Key argues, is a question of law, to be reviewed de novo.

However the issue is characterized, we think the District Court committed no error. If the question is one of fact, the finding is not clearly erroneous. The facts are susceptible of different constructions. It is true that the expenses were incurred in connection with the temporary facility, which, in turn, was used for a time in performance of the Management Agreement. On the other hand, there is no specific proof that any of these expenditures occurred after the Management Agreement was approved. In our previous opinion on this appeal, we observed that “these other agreements [the agreements preceding the Management Agreement] can have no effect with respect to any of the subject matter encompassed by the Management Agreement.” 164 F.3d at 1095. The preceding agreements ended when the main Agreement was approved. Id. at 1094. The view that the costs claimed by Turn Key under this heading are recoverable under the Rental Agreement rather than the Management Agreement is a permissible construction of a sometimes confusing collection of documents. The meaning of ambiguous writings is itself a question of fact. We see no clear error in the result reached by the District Court.

Turn Key may nevertheless be entitled to recover this group of expenditures. In order to do so, however, it must plead a claim under the Rental Agreement, not the

Management Agreement. No claim under the Rental Agreement can be pleaded in the present case, because the Tribe has waived its sovereign immunity only with respect to claims arising under the Management Agreement itself. The Management Agreement, approved by the Chairman of the Commission, did not refer to or incorporate any prior agreements. Turn Key Gaming, Inc., 164 F.3d at 1094-95. The Rental Agreement remained a separate obligation. The Tribe is a sovereign power. It enjoys the same common-law immunity from suit that attaches to all sovereign powers. See Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58 (1978). It has not waived its sovereign immunity with respect to claims under the Rental Agreement. Such claims may not therefore be brought in a federal court. We understand that an action is pending in a tribal court asserting these claims. This opinion is without prejudice to whatever the rights of the parties in that action may be.

In the alternative, Turn Key argues that this amount of $518,231.22 is recoverable under an unjust-enrichment theory. Again, this may be true, but the Tribe's sovereign immunity is a bar to our consideration of this claim. We assume that Turn Key will press this theory in the tribal court.

3. Finally, Turn Key claims an item of $276,503.37 for unreimbursed operating expenses. The District Court found that these items "were not [expended] in furtherance of the Management Agreement." District Court opinion, supra, p. 4. The expenses referred to relate to the opening of the temporary facility and its operation. The proof before us does not contradict the District Court's findings. So we see no error in the findings and conclusions of the District Court on this issue. Our discussion about the immediately preceding item applies equally here.

## IV.

The net principal amount awarded to the Tribe by the District Court was $227,343.45. To this amount the Court added $109,000.28 as prejudgment interest

under state law, S.D. Codified Laws § 21-1-13.1 (Michie 2002). Turn Key argues in its reply brief (for the first time, as far as we know) that this was error because the award should have been governed by federal law. Because the Management Agreement was required by federal law to be approved by a federal official, Turn Key says, federal law governs all aspects of the claim. And, in fact, jurisdiction was laid in Turn Key's complaint under the general federal-question statute, 28 U.S.C. § 1331. We do not agree that the District Court's decision was erroneous for this reason. In Cargill, Inc. v. Taylor Towing Serv., Inc., 642 F.2d 239 (8th Cir. 1981), a case arising under federal admiralty law, we said:

> Generally, the award of prejudgment interest, in the absence of statutory directives, rests in the discretion of the district court. . . . Prejudgment interest is to be awarded whenever damages lawfully due are withheld, unless there are exceptional circumstances to justify the refusal.

Id. at 241-42. We see no abuse of discretion by the District Court in this case.

Accordingly, for the reasons given, the judgment of the District Court is in all respects

Affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.